## Jonathan Whiting and others v. Isaac H. Hill and others.

*Misrepresentations, when no defense.* A misrepresentation, however fraudulent, can be of no avail as a defense, unless it served to deceive the party at the time he became fixed by the treaty. If the party claiming to have been defrauded, before being tied, and while in a situation to retreat without prejudice, in any manner becomes acquainted with the truth, the misrepresentation will not constitute a defense to the contract.

Where, in defense to a bill to foreclose a purchase-price mortgage, damages were claimed in reduction of the amount due on the mortgage, on account of fraudulent misrepresentations alleged to have been made by the complainants at the time of the purchase from them by the defendants of the salt well, blocks and machinery constituting the mortgaged property, and the representations complained of were, in substance, that at the date of the purchase the brine in the well was of ninety degrees of strength, free from gypsum, and of quantity sufficient to supply three or more blocks; and it appeared from the evidence that the defendants, pending negotiations, were, for fifteen days after such representations were made, and before they were bound by the contract of purchase, in possession of, and steadily working, the well; that they were acquainted, and practically familiar, with the business of salt-making, and that during this period the defendants and their agents discovered that the well contained gypsum, and that the brine was greatly deficient in strength and quantity, such representations, if made as alleged, would be no defense to the bill.

*Heard July 8. Decided October 4.*

Appeal in chancery from Bay Circuit.

This bill was filed by Jonathan Whiting, Hiram Wood, George B. Powell, Charles D. Middlebrook and James Remington, against Isaac H. Hill, Stacey B. Hill and Melbourne S. Hale.

The case is fully stated in the opinion.

*Marston & Hatch,* and *G. V. N. Lothrop,* for complainants.

*Grier & McDonell, Ashley Pond* and *S. M. Green,* for defendants.

GRAVES, J.

On the 12th of July, 1864, the complainants owned twenty-three acres and a fraction of land, having a front on Saginaw river, and upon which land were a salt well, two

salt blocks, certain buildings, an engine, machinery and implements for manufacturing salt. The works had been used and known as the Saratoga Salt Works, and the complainants were then, and for some time before had been, carrying the same on, and in so doing conducted the business as copartners of a private firm under the name of the Saratoga Salt Company; but the complainant Remington was the only partner residing in this state, and he lived near the works and was the local manager for the owners in prosecuting the manufacture of salt. The other joint owners and copartners resided in the state of New York.

On the day first mentioned, the defendant Stacey B. Hill, and one F. M. Hale, a brother of defendant Hale, and who assumed to act in the interest of the latter, called upon complainant Remington at the salt works, and entered into a negotiation with him for the purchase, by defendants, of the whole establishment, together with a quantity of wood then also owned by complainants and designed for the salt works. The Hills and F. M. Hale were at the time acquainted with several wells in the vicinity and with the business of salt manufacture there, and they desired to buy this establishment in order to engage in that business. The parties who thus personally began negotiations proceeded to look about the premises and to inspect the well and machinery, and while so doing, and conversing about a trade, the complainant Remington exhibited and passed to Hale a printed circular describing the property, and which had been prepared to attract a purchaser.

The defendants also claim that during this interview Remington made certain oral representations about the property. An arrangement was finally concluded the same day, which contemplated a sale to defendants, and an instrument under seal was drawn up to serve as an agreement to carry out the arrangement. But this instrument, purport-

ing to be made on the one part by the Saratoga Salt Company, was subscribed for the latter by Remington alone, and then only by affixing the company name by himself as treasurer, while the Hills subscribed in person and F. M. Hale added the signature of his brother Melbourne S. Hale.

By the terms of this instrument the property was to be sold to defendants for eighteen thousand dollars, of which five thousand dollars was to be paid instanter, and the residue on or before the 12th of July, 1866, with interest at seven per cent. per annum, and which residue and interest were to be secured by bond and mortgage on the property. It was also stipulated that defendants should have possession of the dwelling-house on the land on or before the first of the ensuing September, and of the remainder of the property immediately, and that a warranty deed conveying the premises, free from incumbrance and containing the usual covenants, should be given on receipt of the five thousand dollars. There was likewise a covenant on the part of the salt company that the "blocks, engine, pumps, etc.," were then in complete running order, *except the east block.* The remaining portions of the writing do not require to be noticed here.

This instrument having been thus prepared, but before any act equivalent to delivery, a conversation sprung up as to Remington's authority to bind his copartners and co-owners, and it was ascertained that he possessed no such power. It was thereupon arranged that the five thousand dollars and the writing should be left at a named bank until Remington's associates should be heard from, and until a proper deed should be delivered; and pursuant to that understanding the writing was placed in the bank, and four thousand dollars of the five thousand dollars to be paid in hand were put there with it, and in a short time afterwards the defendants made up the sum in bank to five thousand dollars.

23 MICH.—51.

The defendants immediately entered into possession of the well and other property, except the dwelling-house.

A few days subsequently, Remington's associates communicated to him their disapproval of some of the terms to which he had consented and which had been inserted in the writing, and among other things insisted that the sum of thirteen thousand dollars to be secured by bond and mortgage should be paid in two installments instead of one, and that three thousand dollars of the amount should be paid in the season of 1865; and when the bond and mortgage came to be executed this change was made.

At length, on the 18th of August, 1864, the deed and bond and mortgage were delivered,—the execution of the latter having been acknowledged on the same day.

The bond and mortgage provided that three thousand dollars should be paid on or before the first day of August, 1865, and ten thousand dollars on or before the 12th day of July, 1866, with interest at seven per cent. per annum, computed from the first day of July, 1864.

The defendants, having gone into possession on the 12th of July, 1864, continued to run the works from that time until the payment of three thousand dollars became due, in August, 1865, at which time, Mr. Hatch, acting for complainants, called for the payment, but the defendants refused to pay, and suggested for the first time to complainants, that the latter were guilty of fraudulent misrepresentations on the sale of the property. The defendants persisting in their refusal to make further payments, the bill in this cause was filed on the 22d of March, 1866, to foreclose the mortgage, and the defendants answered and set up that material representations contained in the printed circular, and others made orally by Remington, at the time of the negotiation, and on which the defendants relied, were false, to the knowledge of complainants, and intended to defraud,

and that the deception thus practiced on defendants had caused them great damage which ought to be allowed them in this suit.

The court below sustained the defense and the complainants appealed. The record is voluminous, but the foregoing outline will sufficiently indicate the nature of the case for the purpose of this opinion. The alleged representations related to the quality and condition of the well and the condition of the salt-blocks; but the main subjects of complaint, and indeed the only ones which will bear examination, are found in those allegations which set up deception concerning the strength and quantity of the brine and its freedom from gypsum.

There is no room for pretense that defendants were deceived by any representations relating to the condition of the blocks. In view of the facts disclosed, the inference is irresistible that defendants did not trust to any statements respecting the then-existing condition of these structures. They were open to inspection and were examined and used by defendants, who appear to have been well informed on such subjects and qualified to form a correct judgment about them. Besides, it is seen that the writing expressly excluded the east block from the condition said to have been imputed to it by the representations, while the west block is confessed to have been in a satisfactory state.

We may, therefore, dismiss from the case every consideration depending upon representations as to the condition of the blocks. As before intimated, the weight of the defense rests upon imputed misrepresentations as to the quantity and strength of the brine supplied by the well and its freedom from gypsum, and an examination of the case upon that theory will cover the whole equity of the answer. The defendants aver in substance, that complainants, know-

ing the same to be false and intending to defraud, untruly represented that the well contained no gypsum; that the brine was of ninety degrees strength and of sufficient quantity to supply three or more blocks, and that the defendants, believing these representations to be true, relied upon them and were thereby induced to purchase the property and to agree to pay the price specified.

The fact of making some of the representations here noticed is controverted and, especially in the form and to the extent given to them in the answer, and the testimony relating thereto is contradictory, while the evidence bearing upon the knowledge of complainants of the untruth of the proved representations is conflicting and unsatisfactory. But the opinion formed of the defense in another aspect of it enables us to dispense with any discussion of these topics. We shall therefore concede, for the purpose of the case, that the representations set up, and a knowledge by complainants of their untruth have been shown by the evidence. It is very essential at the outset to bear in mind one of the distinguishing elements of this defense,—an element not remarked upon by defendants' counsel, but which they seem to have recognized in the answer and generally in the conduct of the case. The defendants do not ground themselves upon a warranty or guaranty that the well or works should continue, after the trade, to perform in a particular manner, or maintain pre-understood or determinate conditions. But they base their claim upon an alleged deception respecting the then state of things. They aver in substance and effect, that at the *date of the trade* the facts were materially different from what they were led to believe they were by the false representations of complainants.

It is true that evidence was given, and properly so in this case, to show the state of things at other times. This proof was pertinent on account of the secondary effect it

might yield in raising an inference, more · or less forcible, that the conditions, claimed to have been imputed by the representations, did or did not exist at the *critical* time, and particular evidence of the same class was admissible, as bearing upon complainants' knowledge of the untruth of the representations and upon the question of damages.

But none of the evidence respecting the state of things at other times could in any way change or enlarge the fundamental issue, and the very nature of the defense prescribes the necessary limits of that issue. Considering the case in the most favorable light for defendants, we are, therefore, to inquire whether the imputed misrepresentations, if made, could have affected the transaction in such manner as to give rise · to the equity asserted by defendants. Now these propositions will not be disputed: A misrepresentation can be of no avail unless it serves to deceive the party at the time he becomes fixed· by the treaty, and he cannot claim to have confided in a statement as true, which at the same time he knew to be false. Hence, however fraudulent and wicked a representation may be, if the innocent party, before being tied and while in a situation to retreat without prejudice, in any manner becomes acquainted with the truth, the misrepresentation will not be a ground of defense against the contract.—*Irvine or Douglas and others v. Kirkpatrick, in House of Lords, 3 E. L. & E., 17.*

In view of these considerations it becomes expedient to ascertain in what stage of the business and at what time the defendants became so fettered as to preclude their retreat without incurring too great a loss from the representations of complainants. The written instrument of the 12th of July, 1864, was not binding, and the evidence demonstrates that Remington and the defendants not only understood that it was not binding, but acted upon the assumption that it possessed no legal force. It was left at

the bank to await the action of the non-resident owners of the property, and subject to a change of terms, which in fact was afterwards effected. The money to be paid down by the terms of the instrument was also, by the verbal arrangement, to be left at the bank to await a conveyance, and but four thousand dollars of this sum was placed there at the time.

. The minds of the complainants and defendants did not meet and assent to the stipulations of the instrument, either in fact or in contemplation of law, and this was well understood and recognized by Remington and defendants. Notwithstanding the preparation of the paper, and notwithstanding that the parties present anticipated that a sale would eventuate in substantial accordance with the terms of the writing, and that they proceeded to conduct themselves conformably to that idea, it is too clear to be disputed that the transaction was incomplete, and that no binding engagement occurred on the 12th of July. We must then pass beyond this date for evidence of any act adapted to oblige the parties, and in so doing, we search the record in vain for any writing for that purpose until the 18th of August, when the deed and bond and mortgage were delivered. The parties appear to have left the business in a shape to admit of no compulsory remedies until that time, unless it should be claimed that the reception by Remington of the first payment changed their position in that regard, and the evidence does show that he received the five-thousand-dollar payment on the 28th or 29th of July. As it may be contended that this payment so altered the situation of the defendants as to prevent their throwing up the business without serious injury, and as the circumstances in evidence must lead to the same result whether the 28th of July or the 18th of August is taken as the turning point, we may waive all objections which may

obtain to considering the date of the first payment as the proper time.

Conceding, then, that complainants represented that the well was free from gypsum, that the brine was of ninety degrees strength, and in quantity sufficient for three blocks, were these representations believed and confided in by defendants on the 28th of July? These representations were then sixteen days old, and during the last fifteen days, at least, the defendants had been in actual possession of the well and steadily working it. The Hills were acquainted with the business of salt-making, and with the wells in that neighborhood, and were practically familiar with the manner of working the wells. Their knowledge on the general subject was ample, and they had abundant opportunity to verify the truth of whatever representations had been made of the conditions then existing. This knowledge and this opportunity they had between the 12th and 28th of July; and the evidence shows that in that time they used both and had their eyes open to ascertain to what extent the actual corresponded with the asserted conditions. Now, it was part of defendants' case, to show that the representations computed to complainants were untrue when made, or at least on the 28th of July; because if they were true at the critical time, the main element in the groundwork of the defense, namely, the untruth of the representations, would be wanting.

In order to substantiate the charge that the representations were false at this period, the defendants not only submitted evidence to prove the state of things at other times, but also introduced defendants' agents and the Hills themselves, to testify concerning the facts as they appeared to them on, and before, the 28th of July; and the evidence thus furnished, as defendants argue, establishes the proposition that the representations were then untrue. This evidence

embraced the personal observations and discoveries of two of the defendants and a number of their agents, made between the 12th and 28th of July, and certainly, if credited, it shows that these witnesses then discovered gypsum and that the brine was greatly deficient in strength and quantity. This proof we must either credit or reject. If we reject it, the defendants' position is not sustained. If we give it credit, it shows necessarily that defendants became acquainted with the real facts in season to recede. They were then in possession under verbal arrangements without having paid any thing, and they held in their hands the products of the well. We do not overlook the circumstance that defendants now claim to have been led to an erroneous view at this time of the true meaning of appearances, by new statements of Remington to which they trusted.

This explanation is too narrow, and fails to meet the necessities of the case. It is quite out of joint with the proved experience and information of the Hills, and the grounds they seem to have had for trusting to the knowledge of Remington, and it does not harmonize with the course of defendants after, as they assert, the defects were conclusively developed. It is inconsistent, also, with the statements of Isaac N. Hill to, and his conduct towards, defendant Middlebrook in February, 1865. At this time, the defendants, according to their evidence, had fully ascertained that the well contained much gypsum, and that the brine was greatly deficient in strength and quantity; and yet Mr. Isaac H. Hill then gave Middlebrook to understand that the three-thousand-dollar payment would be made at maturity. See *Deuel v. Higgins, 9 Mich., 223.*

There is a further difficulty in the way of this explanation. From the evidence, given by defendants as trustworthy, it appears that their agents employed at the works and expert in such matters, found out the defects before the

28th of July.   And when we reflect upon the nature of the subject, the position and relation of the parties and the surrounding circumstances, we think it reasonable to hold that the knowledge of the agents was shared by the principals.   We have not failed to observe that defendants' evidence tends to show that the well grew increasingly worse from the 12th of July, and that defendants claim they were not aware that the injurious conditions were permanent, until long after that time.   But we observe, also, that the right to defend on the ground taken by the answer, depended upon the existence of damaging deviations before the mortgage, and not upon the permanence or subsequent enlargement of the deviations, and that defendants' ignorance that the unfavorable conditions were permanent and growing could not break the effect of their seasonable knowledge of the conditions as they were on the 28th of July.

We have not detailed the evidence, which covers more than six hundred printed pages, nor have we followed counsel in their elaborate quotations from it, but have dwelt rather upon its bearing and effect; and the opinion it leads us to form is, that the defendants on the 28th of July, 1864, had knowledge of all the deviations from the represented conditions which they have proved then existed.

Having reached this conclusion it follows that the decree below must be reversed, with costs, and that complainants must recover the principal and interest secured by the bond and mortgage.   As the special commissioner in the circuit court, under an order there made, ascertained and reported the amount, which he found to be eighteen thousand four hundred and forty-five dollars and sixty-six cents on the 7th day of May, 1870, and as neither party has complained of this part of the report, a further reference will be unnecessary, and the usual decree of foreclosure and sale, which

may be entered, may proceed on the basis of this portion of that report. The decree, however, should give the defendants three months before sale for the payment of the sum reported, with interest at seven per cent. per annum from the seventh of May, 1870, and the case should be remitted to the court below for the execution of the decree.

The complainants will recover their costs in both courts.

The other Justices concurred.