### KINGMAN & CO. v. STODDARD et al.

#### (Circuit Court of Appeals, Seventh Circuit. March 14, 1898.)

#### No. 436.

**1. FRAUD—DISCOVERY WHILE CONTRACT IS EXECUTORY—CONDONATION.**

A party to an executory contract, which contract he was induced to enter into by fraud, cannot, after knowledge of the fraud, continue to carry it out, exacting performance from the other party and receiving its benefits, and still maintain an action for the deceit.

**2. SAME—REMEDY—ACTION FOR DECEIT.**

The right of a party to a contract to defend against an action for the consideration on the ground of fraud is grounded on the same principles as his right of action for the deceit, and facts which would preclude such a defense will also bar an affirmative action.

**3. SAME—FACTS CONSTITUTING CONDONATION.**

Plaintiff entered into a contract with defendants, who were manufacturing corporations, by which it purchased their stock in a third corporation, organized principally to handle their products, and in which they owned the controlling interest. Plaintiff agreed to take up the notes of such corporation held by defendants, and was to have the exclusive sale of defendants' goods in certain territory on stipulated terms. While the contract was still executory, except for the transfer of the stock and the payment of a small part of the consideration therefor, plaintiff discovered that the value of the assets of the corporation whose stock it had bought had been greatly overstated in the negotiations; but it thereafter continued in possession, made further payments, and took up the notes held by defendants, without making any claim of fraud, and, both before and after it had placed the corporation in liquidation, required defendants to furnish it their goods for sale under the terms of the contract. *Held*, that it had condoned any fraud in the negotiations preceding the contract.

In Error to the Circuit Court of the United States for the Northern District of Illinois.

This is an action for deceit brought by the plaintiff in error, Kingman & Co., a corporation of the state of Illinois, against the Stoddard Manufacturing Company, John W. Stoddard, the Milburn Wagon Company, Charles F. Milburn, and Frank D. Suydan. The Stoddard Manufacturing Company was not served with process and did not appear to the action. Kingman & Co. was incorporated for the purpose of and since the year 1882 has been engaged in the business of the manufacture and sale of agricultural implements and farm machinery, having its principal offices at Peoria, in the state of Illinois. Its business extended throughout the states of Illinois, Missouri, Kansas, Arkansas, parts of Kentucky, Tennessee, the eastern part of Iowa, and into the territory of Oklahoma, with branch offices at the cities of St. Louis and Kansas City, and it had the exclusive sale of the manufactures of the Stoddard Manufacturing Company and of the Milburn Wagon Company in the territory mentioned. The Stoddard Manu-

facturing Company is a corporation of the state of Ohio, incorporated in the year 1884, for the purpose of and engaged in the business of the manufacture and sale of agricultural implements, having its principal office and its works at Dayton, Ohio. John W. Stoddard, one of the defendants below, was its president. The Milburn Wagon Company is a corporation of the state of Ohio, organized in the year 1873 for the purpose of and engaged in the business of the manufacture of wagons, carriages, and wheeled vehicles of all kinds, and the material used in their construction, and was located at Toledo, Ohio. Charles F. Milburn, one of the defendants below, was one of its officers. The Moline Plow Company is a corporation of the state of Illinois, located at Moline, in that state, and engaged in the manufacture and sale of plows, harrows, cultivators, and other like articles of husbandry. The Moline Milburn & Stoddard Company is a corporation of the state of Ohio, organized with the object of purchasing and dealing in agricultural implements, appliances, supplies, and all things incident thereto. Its capital stock was $100,000, and was owned in equal parts by the Moline Plow Company, the Milburn Wagon Company, and the Stoddard Manufacturing Company. The company was formed for the purpose of transacting business in the state of Nebraska, in certain parts of Iowa, and in those parts of southern Dakota and southwestern Minnesota which could be managed to good advantage from Omaha, where its principal warehouse and place of business were to be located. The purpose of the company was the sale and distribution of the goods of the Moline Plow Company, the Milburn Wagon Company, the Stoddard Manufacturing Company, and such other goods as it might be desirable to sell in connection therewith. It entered into a contract with the three companies named for the exclusive sale and handling of the several manufactures of those companies in the territory mentioned for a period of five years upon certain terms specified in the contract. In the autumn of the year 1891. Martin Kingman, the president of the plaintiff in error, opened negotiations with J. W. Stoddard, of the Stoddard Manufacturing Company, and with the Milburn Wagon Company, for the purchase of the stock respectively held by those companies in the Moline Milburn & Stoddard Company, which resulted in a letter from Stoddard to Kingman under date of March 5, 1892, in which he states that the book value of the company on November 1, 1891, was about $120,000, and that there would be some shrinkage on the past-due notes and accounts, but that he thought the real estate worth more than the book value, and that a great deal of money had been expended in establishing the business and putting it on its present footing, and suggests that, if he wished to pursue the matter further, he should at his earliest convenience go to Des Moines and Omaha, carefully look over all the property and business. confer fully with Mr. Croy, the manager, and let him exhibit everything, "and fully make up your mind what it is worth to you, and then come to Dayton, and I will go with you to Toledo to see if we can get together." On the 7th of March, 1892, the receipt of that letter was acknowledged by Kingman, who wrote that he would go to Des Moines and Omaha during the then present week, meet Mr. Croy, the manager, and make the investigations proposed if he could finish certain business at Moline. He then states that while at Moline he learned that some large claims reported good by Mr. Croy had been proved worthless. Kingman visited Omaha, March 11, 1892, examined the real estate, buildings, and stock of the Moline Milburn & Stoddard Company, met Croy, the manager, discussed with him the volume and conduct of the company's business, the territory it occupied, and examined the goods it had on hand. He asked Croy for a statement of the business, and was shown the following statement from the books of the business of the company to March 1, 1892:

Assets.

| | |
|---|---|
| Real estate | $ 80,552 61 |
| Furniture and fixtures | 1,239 15 |
| Fair buildings | 2,261 13 |
| Merchandise | 29,209 06 |
| Cash | 4,610 39 |
| Bills receivable | 216,344 93 |
| Accounts receivable | 164,160 20 |
| Total | $498,377 47 |

### Liabilities.

| | |
|---|---|
| Capital stock ............................................................ | $100,000 00 |
| Surplus (Nov. 1, 1891)................................................. | 19,125 85 |
| Surplus to date........................................................... | 8,006 99 |
| Moline consignment .................................................... | 15,181 65 |
| Stoddard consignment ................................................. | 8,272 75 |
| Bills payable ............................................................. | 347,284 71 |
| Accounts payable ........................................................ | 505 52 |
| Total ...................................................................... | $498,377 47 |

Also a statement for the month of February, 1892, taken from the report of the secretary and treasurer, showing the sales for the month to have amounted to $85,178.70, and the total sales from October 1, 1891, to have been $151,998.65; the amount of past-due paper to be $26,459.82. Croy stated, in answer to a suggestion by Kingman, that the amount of past-due paper was small; that he looked sharply after the past-due paper, and gave it special attention. He also stated that in his judgment the stock was worth $150 premium, and that on a cash basis it was worth $125; that he believed the bills receivable and the accounts receivable were equal to those of other houses; and that the bills receivable were all fresh and new. Upon inquiry with respect to the collectibility of the bills and accounts receivable, he stated that he thought the interest accruing upon the bills receivable would go far towards the expense of collecting the outstandings. When asked for an inspection and examination of the books, he pleaded that they were busy at that time, and it could not well be done then. On the 15th of March, Kingman wrote from Peoria to Croy, acknowledging a copy of the statement which was sent him, asking him to look over the bills and accounts receivable, and to make him a list of doubtful ones, with the name and amount; to which Croy responded that, if the notes and accounts on the books were his, he should not agree to discount them very much; that he found some then very doubtful, but accounts that were similar had been collected in full, with interest; that the amount of interest accumulated on the accounts should go far towards meeting any loss that might be sustained; and stating that the total amount of past-due on dealers' notes is about $12,000, this not including farmers' notes; and that most of the doubtful ones were included in the statement given him of past-due. On the 15th of March, Kingman wrote to Stoddard of his visit to Moline, suggesting an interview with the parties with reference to negotiating the purchase of the stock. The parties met at Toledo on the 22d of March, and it is claimed by the plaintiff in error that at that meeting the parties adopted the statements of Croy, and represented them to be true and correct, and that upon those representations he concluded a contract for the purchase of the stock of the Milburn Wagon Company and the Stoddard Manufacturing Company, which contract is as follows:

"This memorandum of agreement made and entered into this 22d day of March, A. D. 1892, by and between the Milburn Wagon Company, of Toledo, Ohio, and the Stoddard Manufacturing Company, of Dayton, Ohio, parties of the first part, and Kingman & Company, of Peoria, Illinois, party of the second part, witnesseth:

"(1) That the said parties of the first part, being owners of six hundred and sixty-six and two-thirds shares of the capital stock of the Moline Milburn and Stoddard Company, of Toledo, Ohio, hereby agree to sell the same to the party of the second part at the rate of one hundred and fifteen dollars ($115) per share of the par value of one hundred dollars ($100). Said transfer to take place upon the first day of April next, subject to the terms and conditions hereinafter mentioned.

"(2) The said party of the second part agrees to buy the stock above mentioned, and to pay for same at the price mentioned in the following manner: Three-tenths of the par value thereof in cash, and the balance in twenty-four equal monthly payments, said deferred payments to draw interest at the rate of six (6) per cent. per annum from April first.

"(3) The party of the second part hereby agrees to take up all notes of the Moline Milburn and Stoddard Company held by the party of the first part, on April first, and give their notes in place thereof in the following manner:

The present value of all of said Moline Milburn and Stoddard Company notes shall be figured on April first, and the party of the second part shall give to the party of the first part their notes in twenty-four equal amounts, maturing one each month; said notes to draw interest at the rate of six (6) per cent. per annum.

"(4) The parties hereto agree to enter into contract under the terms of which the party of the second part shall purchase and handle the goods manufactured by said party of the first part in the territories now controlled by the Moline Milburn and Stoddard Company, in substantially the same manner as they now do in the states of Illinois, Missouri, and Kansas, and at the same prices and terms; the question of freight to be adjusted hereafter.

"(5) The party of the second part agrees to purchase of the party of the first part all of their goods now held on sale by the Moline Milburn and Stoddard Company, at same prices and terms as provided for in contract now existing between parties to this agreement; difference in freight being considered.

"(6) The contracts to be made hereafter between the parties hereto, for the sale of the goods manufactured by the party of the first part, shall be upon the same basis as contracts now existing for the state of Illinois, but shall be made to cover the years 1892 and 1893, with a provision, however, that the prices for the year 1893 shall be the same as for 1892, unless there should be an advance in cost of the goods, in which case prices are to be advanced in proportion to said advance in cost, or, in case of decline in cost, said prices shall be reduced in proportion to said decrease in cost."

Prior to April 1, 1892, Kingman & Co. paid to each one of the two companies $10,000 on account of the purchase, and on the 1st day of April, pursuant to the contract, the stock agreed to be purchased was transferred, and control of the company was given to the purchaser, Kingman being elected president. On April 6, 1892, Kingman learned from one of the officers of the Moline Plow Company that the amount of past-due notes of the Moline Milburn & Stoddard Company was in the neighborhood of $90,000. He, with Schimpff, secretary and treasurer of Kingman & Co., thereupon went to Omaha, and on April 11, 1892, Kingman wrote to Stoddard as follows: "On careful examination, we find that Mr. Croy's statement as to past-due notes and accounts was entirely different from the statement made to me a month ago, which was to the effect that past-due notes amounted to only $26,000, when in reality they amounted to $91,000, and accounts in the same proportion. The system of collecting is through the bank, who have neglected the same. Mr. Croy felt quite disappointed at this revelation, and could not explain why this was a fact, excepting that the bank had not done its duty. when in reality he was the one who had not done his duty. I offered the Moline Plow Company the same price that I purchased your stock for at a meeting with them on Wednesday last, and they decided not to sell. After making the investigation, I wrote them, withdrawing all offers, and would now state that I would not give them par for their stock. It is not worth par, and there will be a large number of losses, much more than the premium paid you and Milburn. I thought on the whole you made a most excellent sale, and while it was a good sale to you I hope I will be able to do enough business this season to get it into shape without a loss by the commencement of next year's business. I directed Croy to forward to you and Milburn a full settlement for all goods sold to the first of April, which he will get out to you in a day or two, and, when received by you, you will please bill to Kingman & Co. with statement, and we will close up the matter."

And under date of April 12, 1892, Kingman wrote to the Milburn Wagon Company as follows: "In the first place, when the writer visited Omaha before, Mr. Croy made up a statement of past-due notes and accounts, said statement showed there was only $26,000 past-due notes, and only a few thousand past-due accounts, when, on really going into the facts of the matter, found there was over $91,000 of notes past due and about $25,000 of accounts. On questioning Mr. Croy as to this, he said the notes had been forwarded for collection through the bank, and that they had instructions to hold them for three months past due before returning them; hence the large accumulation of past-due paper. The writer took him to task about such management, and directed him to call in all notes from banks, and we would handle them direct ourselves. This Croy did not take well to, as it would make the office a good deal of work, but,

if the outstanding past-due notes and accounts do not make a large loss it will be a wonder."

Afterwards, on April 18, 1892, Kingman & Co. delivered to the Milburn Wagon Company and to the Stoddard Manufacturing Company its notes, according to the contract, for the stock and for the notes of the Moline Milburn & Stoddard Company held by such companies respectively. The face value of the notes held by the Stoddard Manufacturing Company amounted to $115,-322.25. The amount of those held by the Milburn Wagon Company is not definitely disclosed by the evidence, but is stated in the declaration to have been $74,314.98. Afterwards, in June, 1892, a more thorough examination of the books of the Moline Milburn & Stoddard Company was made, when it was ascertained, as is claimed, that old bad debts to the amount of many thousands of dollars had been carried on the books for years, and not charged off, as is customary with merchants; that instead of a surplus of $8,006.97 from the business from October 1, 1891, to March 1, 1892, the company had in fact been doing a losing business; that, instead of accounts payable amounting to only $505.52, they amounted on March 1, 1892, to $20,490.17; that the bills and accounts receivable were not fresh and new; that $109,000 of the bills receivable were then past due, and a large amount of the accounts receivable were old and absolutely worthless; that the company had not done a prosperous or profitable business, had never paid a dividend, and, as it was claimed, was then actually insolvent. After this information, and in July, 1892, without complaint or allegation of fraud, Kingman & Co. proposed to the Milburn Wagon Company and to the Stoddard Manufacturing Company to pay the sum of $50,000 if it could be released from its contract, which offer was declined. On July 21, 1892, at the request of Kingman & Co., the Milburn Wagon Company and the Stoddard Manufacturing Company severally agreed to extend the notes of the Moline Milburn & Stoddard Company substantially for one year from the maturity of each, and new notes were given and the old ones surrendered. Three of the notes issued to the Stoddard Manufacturing Company, and maturing, respectively, August 1, September 1, and October 1, 1892, had been discounted, and the latter company agreed to and did take them up at maturity, and returned them to Kingman & Co., and renewal notes were sent in their stead. All the renewal notes were paid at maturity. Kingman testified that the Moline Milburn & Stoddard Company had an established business in the territory which it occupied, selling from three hundred and fifty to four hundred thousand dollars' worth of goods, and controlling other lines of goods, and that if Kingman & Co. went into that territory without buying them out the latter company would necessarily come into competition with the Moline Milburn· & Stoddard Company, and would have to go in with other lines of goods, competing with them, and would have to enter into direct competition with them in the three lines of goods that Kingman & Co. might sell in that territory, and that was one of the purposes which influenced Kingman & Co. to obtain control of the Moline Milburn & Stoddard Company. On June 17th Kingman wrote to the Stoddard Manufacturing Company that the Moline Plow Company had arranged to open a house at Omaha regardless of its contract with the Moline Milburn & Stoddard Company. About the 20th of July, 1892, Kingman & Co. put the Moline Milburn & Stoddard Company into liquidation, because, as Kingman states, he found the Moline Milburn & Stoddard Company to be insolvent, and the Moline Plow Company about to withdraw their goods from sale by the former company at Omaha, and the latter fact was one of the important influences which changed his mind with reference to going on with the Moline Milburn & Stoddard Company. He states that "the withdrawal of their goods was one of the important matters of the volume of trade. Its business would probably be somewhere in the neighborhood of half the business of the Moline Milburn & Stoddard Company." Kingman & Co. took a lease from the Moline Milburn & Stoddard Company of its warehouses at Omaha and Des Moines, commenced business under the name of Kingman & Co. in that territory, and dealt largely with the Stoddard Manufacturing Company and with the Milburn Wagon Company in the sale of the goods of those companies in that territory under contracts made with them for the exclusive sale of their products in that territory during the years 1892 and 1893, amounting to many hundreds of thousands of

dollars. Kingman & Co. maintained during that time an extensive correspondence with both of the other companies named, running into hundreds of letters with each of the companies, without intimation that any fraud had been committed upon or any misrepresentations made to it, and up to the time of the commencement of this action no claim had been preferred against the defendants by Kingman & Co. respecting the fraud complained of. The defendants pleaded substantially: (1) The general issue; (2) that the alleged fraud was condoned, satisfied, and discharged; (3) that the contract in question was ultra vires and in excess of the corporate powers of the plaintiff. At the trial, upon the conclusion of the evidence for the plaintiff below, the case was rested, the defendants moved the court to instruct the jury to find for the defendants, and, the court so instructing, the jury returned a verdict of not guilty.

James H. McIntosh, for plaintiff in error.
John A. McMahon and Barton Smith, for defendants in error.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

JENKINS, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The rule is well settled that one who has been induced, through fraud, to enter into a contract has the election either to rescind, tendering back that which he has received, or, affirming the contract, he may have his action for deceit to recover the damages sustained. We, however, understand this rule to have application to a contract executed wholly or in part, and that the affirmance here spoken of has relation to the completed transaction; that is to say, if rescission be desired, and restoration of that received be not made, the contract is affirmed as to whatever has been done under it, and the defrauded party may still have his action for deceit. But we also understand the rule to be that if he become advised of the fraud perpetrated upon him in season to recede from his engagement, and yet, with knowledge of the falsity of the representations which had induced the contract, elects to perform, and clearly manifests his intention to abide by the contract, he condones the fraud and is without remedy. The contract, being against conscience because of the fraud, is not obligatory upon him, if he shall so elect; but if, when fully informed of the fraud, he voluntarily confirms, ratifies, and performs and exacts performance of the contract, he condones the fraud, and such ratification, like the ratification of the unauthorized act of an agent, relates to the time of the contract, confirming it from its date and purging it of fraud. With respect to an executory contract, one may not, after knowledge of the fraud, continue to carry it out, exacting performance from the other party to it, receive its benefits, and still pursue an action for deceit; and this because continued execution with knowledge of the fraud signifies the ratification of a contract voidable for fraud, and condones the fraud. For example, if one by the imposition of fraudulent practices has been induced to purchase goods, and after their receipt discovers the fraud, he may rescind, or may affirm and have his action for the deceit. But if, before delivery of the goods, he has discovered the fraud, he may not then accept the goods, and still have an action for deceit. He had sustained no injury prior to the discovery of the fraud. He was under no legal obligation to execute a contract imposed upon him through fraud.

Fraud without damage, fallen or inevitable, is not actionable. The loss arises from his acceptance of the goods. This being done with knowledge of the fraud, he has voluntarily brought upon himself the injury. "Volenti non fit injuria." With respect to an executory contract voidable by reason of fraud, the defrauded party, with knowledge of the deceit practiced upon him, may not play fast and loose. He cannot approbate and reprobate. He must deal with the contract and with the wrongdoer at arm's length. He may not, with knowledge of the fraud, speculate upon the advantages or disadvantages of the contract, receiving its benefits, and at the same time repudiate its obligations. .Grymes v. Sanders, 93 U. S. 55, 62; McLean v. Clapp, 141 U. S. 429, 12 Sup. Ct. 29. Fraud is not actionable when the defrauded party, before performance and after knowledge of the fraud, voluntarily ratifies and exacts performance of the contract by the other party thereto. We think the rule thus stated to accord with right principles and to be abundantly supported by authority. In Fitzpatrick v. Flannagan, 106 U. S. 648, 1 Sup. Ct. 369, in respect to a defense that payment of a note was assumed under fraudulent representations as to the character and value of the things sold, the court below instructed that if the jury should find the fact to be as charged, and that the defendant was thereby injured, the damages sustained by him by reason of misrepresentations should be deducted from the amount of the note, "unless you shall find that the defendant, after he had a full knowledge of the misrepresentations, continued to recognize his liability to plaintiffs, and promised to pay after he had acquired such knowledge, in. which case he will be estopped to make such defense." The supreme court sustained this ruling, and observed that of its correctness the court had no doubt. "A subsequent promise, with full knowledge of the facts, is certainly equivalent to an original promise made under similar circumstances, and no one acting with full knowledge can justly say that he has been deceived by false representations. 'Volenti non fit injuria.' "

In Vernol v. Vernol, 63 N. Y. 45, one was induced to enter into an executory contract for the purchase of lands by means of false representations on the part of the vendor, but after discovery of the fraud he accepted a conveyance of the property, and it was held that he could not set up the fraud as a defense in an action for the purchase money. The court observed:

"The false representations made would have been an ample excuse for his nonperformance. While such was the case, the defendant could not avail himself of these false representations to excuse the payment of the price agreed upon if he took the conveyance, and, as he chose to carry the contract into execution, he was bound to pay the plaintiff the balance of the consideration money. If the contract had been in writing, and the plaintiff had brought an action to compel specific performance upon the defendant refusing to fulfill, the false representations would have been a complete defense, but, after the defendant had taken the deed, it would not rest with him to refuse to perform by paying the price agreed upon. He could not reap the fruits of the bargain by taking the property, thus fulfilling in part, and then repudiating the performance of the obligation to pay into which he had entered. Such a course would, under the contract, be advantageous only to one of the contracting parties, and cannot lawfully be upheld."

In People v. Stephens, 71 N. Y. 527, it was held that payments voluntarily made under an executory contract, with full knowledge of facts upon which fraud in the inception of the contract might have been claimed, cannot be recovered back, or damages recovered for the fraud. Allen, J., in delivering the opinion of the court, remarks at page 554:

"It is well settled that a party is not bound to return the property he has been induced by fraud to purchase, but may retain it and take his remedy by action for the fraud; but it by no means follows, either logically or legally, that when he has made an executory contract for property to be delivered and paid for in the future, and discovered that he has been cheated, he can, without objection or protest, receive the property and pay for it, and then sue for the fraud. The fraud in such case is consummated, and legal damage is incurred only by the acceptance of the property and paying for it. Parting with the consideration constitutes the legal damage, and, that being done with full knowledge of the cheat, fraud or deception cannot be alleged."

The principle, we think, finds abundant confirmation. Selway v. Fogg, 5 Mees. & W. 83; Railroad Co. v. Row, 24 Wend. 74; Parsons v. Hughes, 9 Paige, 592; Gilmer v. Ware, 19 Ala. 252; Thweatt v. McLeod, 56 Ala. 375; Doherty v. Bell, 55 Ind. 205; St. John v. Hendrickson, 81 Ind. 350–353; Whiting v. Hill, 23 Mich. 399; Craig v. Bradley, 26 Mich. 354–369; Dailey v. King, 79 Mich. 568, 44 N. W. 959; McEacheran v. Coal Co., 97 Mich. 479, 56 N. W. 860; Electric Co. v. Hart, 103 Mich. 477, 61 N. W. 867; Schmidt v. Mesmer, 116 Cal. 267, 48 Pac. 54; Edwards v. Roberts, 7 Smedes & M. 544; Thompson v. Libby, 36 Minn. 287, 31 N. W. 52.

Mr. Bigelow, in his treatise on Fraud (Ed. 1877, p. 184), states that "if a fraud result in a contract, performance of the same after discovering that it was fraudulently obtained by the opposite party does not preclude a person from suing for damages on account of the fraud,"—citing in support of the proposition Parker v. Marquis, 64 Mo. 38. In his later work upon the same subject, published in 1890 (which is stated in the preface to be not a second edition of the former, but to be entirely rewritten), the proposition quoted is not contained, nor do we find the case referred to cited in support of any such proposition, although he does state (page 68) that "the action may be brought regardless of the question whether in the case of sales to defendant there has been a rescission of the contract, for the plaintiff may elect to affirm the contract and sue for damages sustained by him in being drawn into it,"—citing, among other cases in support of this proposition, the case of Parker v. Marquis; and stating in a note that the case of St. John v. Hendrickson, supra, was wrongly decided, for which statement he refers to Parker v. Marquis as authority. It will be noticed that the learned author does not in the language last quoted make any distinction between executed and executory contracts, but the statement in his first work demands consideration and review of the authority invoked to sustain it. In Parker v. Marquis the plaintiff agreed "to furnish the defendant with 1,134 sheep for one year in good fix, and to bear half the loss of the sheep from death; the defendant agreeing to take, feed, and care for the sheep for that time, to bear half the loss of the sheep, and for his compensation to receive one-half the wool and one-half the lambs."

The defendant alleged that at the time of the delivery of the sheep to him they were afflicted with a disease known as "scab," to the plaintiff's knowledge, which fact was concealed from the defendant; that 206 of them died from the effects of the disease; and that defendant was subject to the expense of feeding and doctoring the sheep, and was damaged by reason of the fraud in an amount which he claimed to recover under the contract. At the trial the defendant proved an expense in time and money in feeding and doctoring the sheep, and it was objected that the measure of damages sought to be established by the defendant was not a proper one, it not having been shown that the defendant offered to return the sheep on the discovery of the fraud. The court sustained the defense upon the ground that, if the care and custody of the sheep were rendered more onerous in consequence of the fraud practiced, the defendant was entitled to compensation therefor. It will be observed that here the sheep had been delivered to and received by the defendant in ignorance of the fraud. We need not stop to inquire whether that case was rightly decided, for it is not the case of one receiving property with knowledge of fraud. The court in its opinion, however, said that, "where a party has been defrauded by another in making an executory contract, a subsequent performance of it on his part, even with the knowledge acquired subsequently to the making and previous to the performance, will not bar him from any remedy for the recovery of damages." It cites in support of that proposition the case of Whitney v. Allaire, 4 Denio, 554, in which the supreme court of New York is supposed to have held to that doctrine. The decision in Whitney v. Allaire was affirmed by the court of appeals in 1 N. Y. 305, by an equally divided court. All that the case holds, as is pointed out in People v. Stephens, supra, by Judge Rapallo at page 540, and by Judge Allen at pages 553 and 556, is that where a lessor falsely and fraudulently represents that the premises described in his contract embrace lands which they do not in fact embrace, the lessee, by taking possession of the premises, actually embraced in the lease, with knowledge of the falsity of the representation, does not preclude himself from claiming from his landlord compensation for the lands which are deficient, or what he reasonably pays to hire them. And Judge Allen points out that the case is cited as authority only by reason of some remarks of the judges not necessary to the decision. In Whitney v. Allaire, Gardner, J., in delivering an opinion for affirmance, states that the contract was not executory, and adds, obiter, that if the agreement was executory it would not, it is believed, change the right of the party. Judge Bronson distinguishes the case from that of Railroad Co. v. Row, 24 Wend. 74, which he had decided, and in which he had said: "But where a party has discovered what he deems a fraud before he has entered upon its performance, he must then decide whether he will stop short or go on with the contract,"—upon the ground that the contract was not wholly executory when the defendant discovered the fraud. Judge Jones, with whom concurred Judge Gray, favored reversal on the ground that a defendant, by taking and enjoying possession after the discovery of the alleged fraud,

had elected to affirm the contract, and therefore had no legal cause of complaint. It will be seen, therefore, that the case upon which the decision in Parker v. Marquis is predicated cannot be considered of controlling authority, even if it had not been repudiated in the later decision of People v. Stephens. The subject was further considered in Pryor v. Foster, 130 N. Y. 171, 29 N. E. 123, distinguishing the case of People v. Stephens, stating that in that case the contract, unlike the one then under consideration, was executory and materially different. The present holding of the courts of New York seems, therefore, to be that the performance of an executory contract after knowledge of the fraud precludes a recovery.

The thought is well expressed in Selway v. Fogg, 5 Mees. & W. 83-85, where Lord Abinger, C. B., said: "Secondly, it was clear upon the evidence that the plaintiff had full knowledge of all that constituted the fraud in this case either before or during the work, and as soon as he knew it he should have discontinued the work and repudiated the contract, or he must be bound by its terms." And Parke, B., said: "I also think that upon discovering the fraud (unless he meant to proceed according to the terms of the contract) the plaintiff should immediately have declared off, and sought compensation for the by-gone time in an action for deceit. Not doing this, but continuing the work, as he has done, he is bound by the express terms of the contract, and, if he fail to recover on that, he cannot recover at all." And why not? Fraud is indeed odious, and should be condemned; but why should the defrauded party, with knowledge of the wrong perpetrated upon him, be permitted to speculate upon the wrong, enhancing the injury if the speculation prove disastrous? Why should the wrongdoer be mulcted in damages which the defrauded party has with knowledge of the fraud brought upon himself? Why should the latter be permitted to refer the injury which he has incurred with his eyes open to the original wrong by which he was induced to execute a contract which could not be enforced against him? Suppose, for example, that one, through false representations, be induced to enter into contract to furnish the plant necessary to the operation of a mine, and to agree to expend in its development, say not less than $100,000 per annum for the term of five years; there is neither sense nor justice in holding that, after discovery of the fraud, he may continue to carry out the contract, to advance large sums of money in its performance, and, when disaster has come upon the enterprise, he may look to the original wrongdoer for reimbursement for the loss voluntarily incurred. Cases may possibly arise where the defrauded party may, by reason of the wrong, be unable to recede from his situation without prejudice. A proper rule will doubtless be found to govern such cases when they arise. But where he can safely retreat we think he should, as Judge Bronson expresses the thought, "decide whether he will stop short or go on." The statement in Whitney v. Allaire, supra, and in Allaire v. Whitney, 1 Hill, 484, is founded upon the technical notion that when one is drawn into a contract by fraud a right of action immediately arises, although but nominal damages have been incurred, and that, the right of action being complete upon execution of the contract, its performance by the party defrauded, after knowledge of the fraud, does not extinguish the right. This view, we

think, is unsound. There can be no action for fraud where no injury has resulted. A consequential injury in such cases is of the gist of the action. The theory in question loses sight of the fact that the contract was voidable at the election of the defrauded party; that it was within his power to waive and to condone the fraud, and to ratify the contract; and that he should be held to do that when, with knowledge of his rights, he voluntarily elects to pursue and perform the contract and to exact performance by the other party. Some of the courts seem to have recognized the injustice of the rule as stated by Mr. Bigelow, and, without antagonizing, to have got away from it by holding that continued recognition and performance of the contract, and subsequent dealing with the wrongdoer touching the subject of the contract, deprive him of his right of action under the doctrine of estoppel or the doctrine of waiver. The better way, we think, is to refuse to be guided by a doctrine that is founded, if it has any foundation at all, upon mere technicality, and that is in subversion of justice. However that may be, the rule itself seems to be established, and is thus stated by Judge Cooley in his work on Torts, star page 505: "A fraud may also be waived by an express affirmance of the contract. When an affirmance is relied upon, it should appear that the party having the right to complain of the fraud had freely, and with full knowledge of his rights, in some form clearly manifested his intention to abide by the contract, and waive any remedy he might have had for the deception,"—citing, in support, a large number of authorities, some of which have been referred to. This rule deals justly both with the defrauded and the defrauder, compelling the latter to respond for the actual damages his wrong has occasioned and no more, and requiring the former, when his eyes are open to the wrong done, to "decide whether he will stop short or go on"; whether he will condone the fraud, and exact performance of the contract, or, repudiating the contract so far as it remains executory, pursue his remedy for compensation for the injury sustained to that time.

It is urged that some of the authorities referred to, notably Fitzpatrick v. Flannagan and Thweatt v. McLeod, relate to the defense of fraud in answer to an action to recover the contract price, and that they are not authority for the rule to which they are cited, because, as it is said, the defrauded party has two remedies,—one by action for the deceit, and one by way of defense to an action on the contract,—and that the interposition of the one is a waiver of the other, under the doctrine of the election of remedies. We think counsel have mistakenly interpreted the decisions. They determine the defense of fraud upon grounds which go to the foundation of the right, and upon reasoning which is equally forceful in a direct action for deceit. We think it fallacious to say that one defrauded may so deal in respect of an executory contract after knowledge of the fraud that he shall lose his right of defense when sued for the consideration, and yet may have his action for the deceit. The remedy by way of defense is allowed to avoid circuity of action, and it is grounded upon and is governed by the same principles as the action for deceit. If the one cannot prevail, the other must fall. If the one can be sustained, the other is upheld. Judgment in the one case is res adjudicata and concludes the right. Burnett v. Smith, 4 Gray, 50.

It remains to consider whether the principles declared embrace the case presented and justify the action of the court below. The contract in question was executory. Kingman & Co. agreed to purchase, and the two other companies agreed to sell, the respective holdings of stock of the two companies in the Moline Milburn & Stoddard Company and all the notes of the Moline Milburn & Stoddard Company held by the two companies named. Payment for the stock was to be made three-tenths of the par value in cash, and the balance in 24 equal monthly payments, with interest from April 1st following, when the stock was to be delivered. The notes to be purchased were to be paid for by the notes of Kingman & Co. in 24 equal amounts, maturing one each month from April 1st following. Kingman & Co. agreed to buy all the goods of the other two companies then held on sale by the Moline Milburn & Stoddard Company, at the prices and upon the terms contained in contracts then existing between the parties with respect to the sale of their respective manufactures in other territory. The parties also agreed to enter into contract by which Kingman & Co. should have the exclusive sale of the goods manufactured by the other two companies in the territories then controlled by the Moline Milburn & Stoddard Company, at the same prices and upon the same terms and in the same manner as it then did in the states of Illinois, Missouri, and Kansas, and for the years 1892 and 1893. It will thus be seen that, as one of the considerations for the purchase by Kingman & Co. of the stock belonging to the other two companies in the Moline Milburn & Stoddard Company, and of the notes of the latter company held by the two companies, Kingman & Co. obtained the exclusive sale of the goods of the two companies, selling their interest for two years in the territory occupied by the Moline Milburn & Stoddard Company, and at prices which obtained, with reference to the disposition of such manufactures, in other states as determined by existing contracts. We must consider these stipulations for the sale of the stock and the notes in granting the exclusive sale of manufactured goods as dependent one upon the other; for it cannot be supposed that the two companies would give to Kingman & Co. exclusive sale of their goods in the territory occupied by a company of which they were the principal proprietors owning two-thirds of its stock. We assume that there was sufficient in the testimony to carry the case to a jury upon the subject of false representations, and also assume that the defendants in error are bound by the representations of Croy. It is not disputed that the written statements submitted by Croy to Kingman were correct transcripts from the books. The misrepresentation then consisted in the statement of Croy that there was only $26,000 of past-due notes, when, as a matter of fact, there was over $90,000 of past-due notes. We need not inquire whether this misstatement could have been innocently made by Croy, the manager of the business, supposing it to have occurred through failure to keep proper books of accounts, and to charge off to the account of profit and loss debts ascertained to be bad; nor need we stop to consider whether Kingman, an experienced business man, had a right to rely upon the representation in view of the fact

that the statement showed no profit and loss account, and in view of his testimony that he, an experienced business man, was surprised that there should be so small an amount of past-due receivables in a total of $380,000 of receivables; but we assume that the false statement was deliberately made, for the purpose of deception, and that Kingman had a right to rely upon it. We also assume that he might properly disregard the rumor which came to his ears before the making of the contract, and before his visit to Omaha, on the 11th of April, that some large claims reported good by Mr. Croy had proven worthless. On the 1st day of April the stock was transferred to Kingman & Co., the directory of the Moline Milburn & Stoddard Company was reorganized, and Kingman & Co. placed in full control of that corporation. On April 6th Kingman learned from the officers of the Moline Plow Company, which company owned one-third of the stock of the Moline Milburn & Stoddard Company, that the amount of past-due bills receivable of the latter company was in the neighborhood of $90,000. With his secretary and treasurer he proceeded to Omaha, inspected the books, found that the amount of past-due notes receivable was $91,000 instead of $26,000, as represented, and the accounts receivable were in the same proportion. If there was fraud and false representation in the transaction, he knew it then. He states, under date of the 12th of April, that he had previously offered the Moline Plow Company for its stock in the Moline Milburn & Stoddard Company the same price he had agreed to pay the two companies with whom he contracted, but that since the investigation he had withdrawn all offers, and states that he would not then give them par for their stock; that it was not worth par; that there would be a large number of losses, —much more than the premiums paid; and that, while it was a good sale by the Milburn Wagon Company and the Stoddard Manufacturing Company, he trusted to do enough business during the then present season to get the matter into shape without loss by the commencement of next year's business. He also states: "If the outstanding past-due notes and accounts do not make a large loss it will be a wonder." With this knowledge of the wrong perpetrated and of misrepresentation to the extent, at least, of $65,000, on the 18th of April, Kingman & Co. delivered to the Milburn Wagon Company and to the Stoddard Manufacturing Company its notes, according to the contract, for the shares of stock purchased, and also its notes for the promissory notes of the Moline Milburn & Stoddard Company held by the two corporations with whom he contracted, amounting to over $189,500, and took the notes. A more thorough examination of the books was had in June following, and it was found that the past-due bills receivable amounted to $109,000, and that a large amount—how much is not stated—were old and worthless, and it is claimed that the concern was practically insolvent. And yet, with this knowledge, Kingman & Co. continued in the execution of the contract, and exacted performance of it by the other parties thereto, taking the exclusive sale of the goods of the Milburn Wagon Company and the Stoddard Manufacturing Company in the territory of the Moline Milburn & Stoddard Company;

and in July, 1892, without the suggestion of fraud, sought to retire from its contract by offering to pay the sum of $50,000 for a release, and, therein failing, subsequently, in the month of July, 1892, procured from the Milburn Wagon Company and the Stoddard Manufacturing Company the extension of the notes given to them, respectively, for the period of one year, and paid them at maturity; procured the Stoddard Manufacturing Company to take up certain of the notes of Kingman & Co. which had been discounted for the former company, and to extend them; and notwithstanding Kingman & Co. dealt with the other two companies for a year or more thereafter, and was in almost daily correspondence with them down to the commencement of this suit, no suggestion or imputation of fraud was preferred. We think it entirely clear that Kingman & Co., with knowledge of the fraud, if fraud there was, clearly manifested its determination to proceed with the contract notwithstanding the fraud, to accept its benefits, and so condoned the fraud. It is worthy of remark that the Moline Milburn & Stoddard Company was not put into liquidation by Kingman & Co., who controlled it, until the Moline Plow Company, which owned a third of the stock of the Moline Milburn & Stoddard Company, had indicated its intention to withdraw the sale of their goods from the latter, and which constituted one-half of the business of the Moline Milburn & Stoddard Company, and that Kingman & Co. took to itself from the Moline Milburn & Stoddard Company, which it controlled, a lease of all its property, nominally stopping the business of the Moline Milburn & Stoddard Company, but carrying it on in the name of Kingman & Co. in that territory, and exacting performance by the Milburn Wagon Company and the Stoddard Manufacturing Company of their covenant in this contract to grant to Kingman & Co. the exclusive sale in that territory of their respective manufactures. The failure of Kingman & Co. to repudiate this contract when it claimed the fraud became known to it, and its insistence upon the performance of the contract at that time, are remarkable, if it in fact deemed itself defrauded. Its action in putting the Moline Milburn & Stoddard Company into liquidation in July, but retaining control of the territory and of the exclusive sale of the manufactures of the Milburn Wagon Company and the Stoddard Manufacturing Company within that territory, is explainable only upon the fact that it was done in retaliation of the action of the Moline Plow Company, which owned a third part of the stock of the Moline Milburn & Stoddard Company, in withdrawing from the latter company the exclusive right to the sale of its goods in that territory, and which comprised one-half of the business of the Moline Milburn & Stoddard Company. There was here, as we think, within the principles stated, a clear ratification of the contract with knowledge of the alleged fraud and a clear condonation of the fraud, if fraud there was. This conclusion renders it unnecessary for us to consider the interesting questions presented at the bar, whether the Milburn Wagon Company and the Stoddard Manufacturing Company are responsible for the statements of Croy, assuming that they had not

85 F.—48

confirmed them, whether the contract was ultra vires of the plaintiff in error, and, if so, whether such defense can be urged in bar of fraud inducing such contract. The judgment is affirmed.