Peelle, J.,
delivered tbe opinion of tbe court:
This action grows out of tbe contract, made part of tbe petition herein, entered into November 3,1892, by tbe claimant with Maj. W. S. Stanton, Corps of Engineers, United States Army, acting for and on behalf of tbe defendants for dredging in and removing tbe logs and stumps from the Cape Fear River, below Wilmington, in the State of North Carolina.
The work was to be done in accordance with tbe specifications *356 furnished by the defendants for the information of bidders as set forth in the advertisement for sealed proposals made part of the contract.
The gist of the action disclosed by the findings is that the claimant, in making his bid for the work, relied upon the specifications furnished by the defendants and that the specifications so relied upon contained errors in respect of the numerical quantities of material to be excavated, by reason of which, to entitle the claimant to the compensation provided for in the contract, it became necessary for him to move his dredging machines over more extensive areas than those stated in the specifications, thereby increasing the cost of the work to his damage.
To entitle the claimant to recover, he must show that the Government, by the specifications submitted for the information of bidders, thereby became a guarantor in respect of the correctness of the approximate quantities of material to be excavated.
Paragraph 33 of the specifications, under the head of “ General instructions for bidders,” reads:
“ It is understood and agreed that the quantities given are approximate only, and it must be understood that no claim shall be made against the United States on account of any excess or deficiency, absolute or relative, in the same. Bidders are expected to examine the drawings and are invited to make the estimate of quantities for themselves.”
The foregoing was intended as notice to the claimant that the quantities of materia] to be excavated were approximate only, and he was therein further notified that, whether the quantities so approximately given should turn out to be more or less, no claim should be made by him against the United States on account thereof; and then, to guard against being misled by such approximate quantities, bidders were, as therein stated, expected and invited to examine the drawings and make estimates for themselves.
Had this been done, there can be no question but that the errors complained of would have been discovered by the claimant, as they were by other bidders.
The specifications, under the head of “Details of the work,” in the first paragraph thereof, recite the work to be done — i. e., “to deepen to 18 feet at mean low water * * * the present channel through eight shoals, aggregating 58,300 feet in length.”
*357 And, as a basis from which to work, the length, width, and depth theretofore dredged in each of the shoals, together with the character of the materials removed therefrom, are particularly given; and so the length, width, and depth to be dredged are stated with equal particularity, but the quantities of materials to be removed are stated as approximate only.
In other words, the specifications show that the channel of a given length and width through the shoals had been dredged a depth of 16 feet at mean low water, while the work to be done as therein provided was to deepen the channel to 18 feet a “uniform width, to be prescribed by the engineer in charge, through all the shoals.”
To illustrate, take the shoal described:
“ Second. Opposite Beeves Point, 17 miles below Wilmington, a channel in one straight reach has been dredged to the full width of 270 feet and depth of 16 feet for a length of 700 feet. The material removed was principally sand and mud in various proportions. No logs or stumps were found. To obtain a depth of 18 feet will require dredging for a length of about 2,000 feet, and if dredged to the width of 100 feet, should funds allow, will require the removal of, approximately, 24,000 cubic yards.”
By making computation upon the basis there given it will readily be seen that to excavate 24,000 cubic yards within the area stated would require dredging to a depth of more than 3 feet, whereas by the specifications only 2 feet were required, thus showing an error in the quantity stated of more than one-third.
The order in which the shoals were to be dredged, as well as the width thereof, were, by the terms of the specifications, subject to be varied by the engineer in charge; and any “ excess or deficiency in depth and width” was to be determined by him. So that the claimant when he made his bid was, by the terms of the specifications, given all the information necessary to enable him to make his bid understandingly.
No information regarding the specifications or work to be done thereunder was withheld from the claimant. On the contrary, in addition to the information conveyed by the specifications, the errors complained of in overstating the quantities of material to be excavated in the several shoals were by the engineer made known to the bidders, including a representative of the claimant who was present, before the bids were *358 opened, but tbe claimant’s bid was not changed or withdrawn on account thereof.
As to the legal effect of such notice and whether the conversation in relation thereto was merged in the contract, as previous negotiations varying the terms of a written contract ordinarily are, we deem it unnecessary to pass upon in the view we take of this case. See Brawley v. United, States (96 U. S. R., 173).
The errors consist in this, that the defendants’ officer, while giving a correct basis for computation, stated an erroneous result in respect of the quantities of material to be excavated.
It is as if he had correctly itemized an account and then made a mistake in his addition.
All the factors for the computation were correctly given and were open to bidders, and they were expected and invited to make computations for themselves.
They were by the terms of the specifications “cautioned to satisfy themselves of the character of the material and of the conditions of the work.”
To uphold the claimant in his contention in the face of the specifiations inviting bidders “to make the estimate of quantities for themselves,” some of whom did so and framed their bids accordingly, would be giving the claimant an undue advantage over his competitors in securing the contract, with a right of action over against the Government for any loss he might have sustained by reason of his own neglect in not discovering the errors of which- he complains. To so hold would in our opinion tend to defeat the purpose of the law requiring public works to be let by advertisement to the lowest responsible bidder. And this we say though no notice had been given to the claimant concerning the discovery of the errors before the bids were opened.
During the progress of the work the defendants’ engineer in charge and the claimant entered into the supplemental agreement of March 8,1894, set forth in the findings, whereby the claimant agreed that in the respect of the quantity of work done and to be done under the original contract to entitle him to not less than $125,000, nor more than $140,000, the same might be reduced so that the compensation should be not less than $98,000, nor more than $113,000.
And thereafter, on October 31,1894, the parties entered into *359 tbe further supplemental contract; set out in the findings, whereby it was agreed that the dredging to the full amount of $140,000, provided for in the original contract so reduced as aforesaid, should be restored; and the claimant, though he avers in his petition that he discovered the errors he complains of in January, 1894, signed that contract without protest or objection, and performed the work for which he was paid the maximum compensation as aforesaid.
A question somewhat similarJ;o the one involved in this case was passed upon recently by the Supreme Court of the United States in the case of James JS. Simpson et al. v. The United States, (172 U. S. B.., 372), affirming the judgment of this court in dismissing the petition.
In that case an appropriation had been made for the construction, among others, of a dry dock at the Brooklyn Navy-Yard, and theNavy Department directed that the civil engineer at the yard should, among other things, have borings made to “ ascertain the nature of the soil to be excavated for the pit or basin of the dock,” and also to ascertain “ to what depth, if any, below the line of water mark it will be necessary to have the piling driven to secure a proper foundation for the structure.”
Pursuant to such instructions, the engineer made an examination of the soil and caused borings to be made “to a depth of from 39 to 46 feet.” The result of these borings was delineated on a profile plan purporting to show the character of the underlying soil, “which indicated that the soil at the depth stated was stable and contained no quicksand.”
The advertisement for proposals contained no detailed plans for the work, but bidders were “invited to submit plans and specifications” therefor; and “for information in regard to the location and site” they were referred to the commandant of the navy-yard.
Upon the examination and borings so made by the engineer showing a stable soil, the contractors, without making any examination for themselves, relied and made their bid, and with it submitted specifications, providing, among other things, that the dry docks should be located “upon available sites to be provided by the Government.” Their bid and plans were accepted, and a contract was entered into accordingly.
After the work had progressed for some months it was ascertained that, a “sand stratum” underlay the area of the site, *360 “beginning at a depth of from 26 to 30 feet below the grade of the site and extending to a depth of 70 feet below the same,” by reason of which the contractors necessarily incurred much greater expense than would have been necessary had the examination and borings upon which they relied shown the actual condition of the soil.
The theory upon which that case was prosecuted was that the Government, by the written contract agreeing to provide an available site, thereby “guaranteed the nature of the soil under the site ” and assumed the entire burden, in case it should be ascertained during the progress of the work “that the soil under the selected site differed, to the detriment of the contractors, from that delineated upon the profile plan which had been made by an officer of the United States.”
In meeting that theory the court said: “We look in vain for any statement or agreement or even intimation that any warranty, express or implied, in favor of the contractors was entered into concerning the character of the underlying soil.”
* * * “ The fact that the bidders knew that a test of the soil in the yard had been made, and drew the contract providing that the dock should be located on a site to be designated by the United States, without any express stipulation that there was a warranty in their favor that the ground selected should be of a defined character, precludes the conception that the terms of the contract imposed such obligation on the Government in the absence of a full and clear expression to that effect, or at least an unavoidable implication.”
So in the case at bar there are no words in the contract or specifications, made part thereof, indicating a warranty in the claimants’ favor that the material to be excavated should be of a definite or even an approximate quantity.
It is not a case wherein the quantities of material merely are given, but the factors for ascertaining the quantities in each of the shoals are given as well, and were open to bidders, who were invited to make estimates for themselves.
In the Simpson Case {supra) there was no stipulation or requirement that the contractors should examine the site to ascertain for themselves the character and nature of the soil. On the contrary, they submitted their own specifications, agreeing to do the work as therein provided, the Government to furnish “an available site,” while in the case at bar the specifications were prepared and furnished by the defendants’ officer, *361 in wbicli it was expressly “agreed that the quantities given are approximate only,” and that no claim should “be made against the United States on account of any excess or deficiency, absolute or relative, in the same;” and to guard against errors to their detriment, bidders were invited to make estimates for themselves.
As it was equally open to the claimant to know of the errors before he made his bid, if indeed the errors were not apparent on the face of the specifications, he must be presumed to have had knowledge thereof. Hence the Government can not, in the absence of an express or an .unavoidable implied provision therefor in the contract, be held to have guaranteed that the erroneous quantities stated were correct.
The petition is therefore dismissed.