SIMON v. GOODYEAR METALLIC RUBBER SHOE CO.

(Circuit Court of Appeals, Sixth Circuit. December 4, 1900.)

No. 842.

1. FRAUD—ACTION FOR DECEIT—REPRESENTATIONS INDUCING CONTRACT.

Defendant's agent secured a contract from plaintiff to supply to defendant in the future a large quantity of rubber waste by representing that a competing company was "entirely out of business," and that defendant would thereafter be practically without competition in the market, which would tend to reduce the price of the article. The competing company, which held leases on the works of five constituent companies, did in fact dissolve, but its constituent companies each thereafter operated its own works, and entered the market as a purchaser of waste; and the competition thereby created caused an advance in the price to such an extent that plaintiff was compelled to pay more than he received for the rubber to fill his contract. *Held*, that the question whether the representation made by defendant's agent was fraudulent depended on whether he meant plaintiff to understand that the five factories then operated by the competing company had gone out of business, which was a question of fact to be determined by the jury.

**2. Same—Waiver—Performance of Contract after Knowledge of Fraud.**

Where a party who has contracted to sell and deliver a commodity in the future at a fixed price learns while the contract is still to a large extent executory that representations of fact made by the other party, which induced him to enter into the contract, were false, he has his election to repudiate the contract at once, and sue for the loss he has already incurred, or to go on with it; and, if he continues performance and completes his deliveries thereunder, he waives the deceit and affirms the contract, and cannot thereafter maintain an action for the deceit, even to the extent of recovering damages to the amount of the loss incurred before his knowledge that the contract was not obligatory.

**3. Same.**

It is not essential, to entitle a party to disaffirm a contract on the ground that it was induced by fraudulent representations, that the party making such representations knew them to be false, but they are equally fraudulent if made without knowledge of their truth, with the intention that they should be acted upon; and hence the party deceived is put to his election whether he will go on with the contract on discovering, while it is still executory, that the representations were in fact false.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

This was an action for fraud and deceit in the procurement of a contract for the sale of 250 tons of rubber waste, and for the recovery of the damages sustained by the plaintiff, Aaron Simon, in the execution of the contract. Upon the conclusion of the plaintiff's evidence, the court directed a verdict for the defendant. This instruction, as we learn from the charge itself, was based upon two grounds: First, that the representations which induced the contract were either promissory in character or true in fact; second, that the contract was still largely executory when the plaintiff acquired full knowledge of the alleged false and deceitful representations made to induce the sale, and with such knowledge proceeded to execute it according to its terms, and thereby waived the fraud and deceit for which he now sues.

The evidence shows that the plaintiff had for many years been engaged in the business of buying old rubber boots and shoes, and selling same to manufacturers engaged in the business of reclaiming the rubber. For several years prior to 1895 the principal consumer of such rubber waste had been a company known as the Rubber Reclaiming Company of New York. This company had a New Jersey charter, under which five subordinate corporations were sheltered, the factories of each being leased to and operated by the dominating corporation. In 1894 the United States Rubber Company, another combination of rubber manufacturing corporations, engaged also in the business of reclaiming rubber waste, and became a large competitor for such waste in the market. Beside these two great customers, there were several small factories engaged in buying and reclaiming, but their competition was of little or no importance, as their capacity was small. In this condition of things, one William J. Rodenbach, the buyer for all of the factories controlled by the United States Rubber Company, approached the plaintiff and urged him to take a contract to sell for the use of the Goodyear Metallic Rubber Company, one of the allied corporations operating under the United States Rubber Company, several hundred tons of old rubber shoes and boots, deliverable in monthly installments. The plaintiff's evidence tended to show that Simon was reluctant to make so large a contract, inasmuch as he carried no stock, and would be obliged to send out agents and buy from collectors in order to comply with its terms. This reluctance was made known to Rodenbach. To overcome this and induce plaintiff to contract as desired, the plaintiff testified as follows: "He told me he wants to give us a chance to make a few dollars this time, and there would be a good chance to make a dollar this time, because rubbers are going to be cheaper. He says, 'The spring is coming pretty near, and the Rubber Reclaiming Company is entirely out of business.' It means our best customer is gone. And he wants me to enter into a large contract for four or five hundred tons for future delivery at a fixed price. He told me that the

Rubber Reclaiming Company was entirely out of business, and that the Goodyear Metallic Rubber Shoe Company, or the company Mr. Rodenbach represented at the time, would be the only consumers of rubber. He told me at the office that, if we would buy any more lots of rubbers, he has got to buy them at a less price than he paid us, and then, if he bought in the city, he would not pay as much as he paid us. I asked him about the competition in Cleveland and Buffalo, and he said he would avoid the competition of Cleveland and Buffalo. He said, 'I did not come to rob you of your money.' He said the market would be a good deal lower, because nobody would be in the market for rubbers; there would not be any competition at all any more; they would be the only consumers. Q. How many times, in the course of the hour or hour and a half he was there in your office, did he tell you that the Rubber Reclaiming Company was entirely out of business? A. He told me that three times, anyway, in different ways. He wanted to make a contract for either four or five hundred tons. Q. Did he say the Rubber Reclaiming Company was then out of the business? A. He said they were entirely out of the business. Those were the words he used. And we would be the only consumers of the article, he said, except there might be a few small orders, but we would be the main consumers. Q. What others did he say? A. He didn't mention anything. I asked him how many more there would be left after the Rubber Reclaiming Company had gone out of business, and he said they would practically be the only consumers of the article." Plaintiff also testified that he relied upon the truth of the statement made by Rodenbach, and contracted to sell and deliver 250 tons of rubber waste at 4⅜ cents per pound, deliverable "in about equal monthly installments" by September 1, 1895. This contract is dated April 18, 1895. There was no direct evidence as to what Rodenbach actually knew of the plans and purposes of the Rubber Reclaiming Company in respect of a continuance in business. But there was evidence tending to show that the Goodyear Metallic Rubber Company, the defendant in error, was one of the constituent companies comprising the dominating corporation called the United States Rubber Company, and that its affairs were entirely controlled and dictated by it through the ownership of its capital stock. There was also evidence tending to show that while an actual dissolution of the bonds uniting the corporate members of the Rubber Reclaiming Company did not occur until May 6, 1895, such dissolution had been determined upon in March, 1895, and that the officers of the United States Rubber Company were informed by the president of the Rubber Reclaiming Company that such dissolution would occur, and that several of its constituent corporations would thereafter continue in business each for itself. There was also evidence tending to show that within a few days after the contract with Simon the market for rubber waste became active and the price higher, and that the agents for the separate companies of the Rubber Reclaiming Company appeared in the market as competitive buyers in May following. The plaintiff conceded that he learned of this activity in the market before he made his first delivery, May 2, 1895, and that before he made any other delivery he knew that some of the corporate members of the Rubber Reclaiming Company were separately engaged in buying and reclaiming old rubber. Finding that this unexpected competition had advanced the price of such waste, and that as a consequence he could not buy to fill his contract except at a loss, he made vain efforts, by correspondence and personal intercession, to obtain some concession in quantity or some advance in price. Failing in this, he notified defendant that he would carry out his contract, and hold it responsible, in an action for fraud and deceit, for the loss he might sustain. He accordingly continued to buy and make deliveries, obtaining a concession in respect to deliveries until December 1, 1895, and received for each such monthly delivery payment at the contract price. The evidence tended to show that in buying to fill his contract he paid an average of 4¾ cents per pound, and received 4⅜ cents per pound, thereby sustaining a loss of the difference, aggregating about $4,000.

Alfred Lucking, for plaintiff in error.

F. W. Whiting, for defendant in error.

Before LURTON and SEVERENS, Circuit Judges, and EVANS, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

The question as to what Rodenbach meant Simon to understand when he said "the Rubber Reclaiming Company is entirely out of business" was not so clear as to justify the court in taking it from the jury. That statement was not promissory in character. It was a definite statement of an existing fact. It was a true statement, substantially, for that particular corporation had resolved to surrender its charter and cancel its leases upon the factories of the five subordinate corporations. The dissolution of the Rubber Reclaiming Company meant the sundering of the bonds which prevented the independent conduct of the same business by the five corporations whose factories had theretofore been operated by it. Now, did Rodenbach mean that Simon should understand that these five factories theretofore operated by it would cease to be operated, and would be out of the market as customers for rubber waste? If he did, it was an untrue and deceptive representation. Those factories continued in the business of reclaiming old rubber, and, at the time Rodenbach made his representation, it was intended and expected that they should so continue in business, each for itself. When the officials of the Rubber Reclaiming Company advised the officials of the United States Rubber Company of the purpose of the Rubber Reclaiming Company to dissolve, they also informed them of the purpose of at least some of the corporations whose factories they had theretofore operated to continue in business each for itself, and the United States Rubber Company was sounded with a view to a new combination which should include these factories. The Goodyear Rubber Company was but one of the controlled instrumentalities through which the United States Rubber Company was engaged in the business of reclaiming old rubber waste, and Rodenbach was the purchasing agent of such material for the Goodyear Rubber Company. Within a very few days after knowledge of the purposes of the Rubber Reclaiming Company reached the United States Rubber Company, Rodenbach is found in Detroit, endeavoring to obtain a large contract for old rubber. Simon was reluctant to engage himself so deeply. The amount he could collect and the price he would have to pay would be affected by the competition for such material. Nathaniel C. Mitchell, the president of the Rubber Reclaiming Company, and of one of the corporations whose factory was operated by the Rubber Reclaiming Company, in his evidence, in speaking of the effect upon the price of rubber waste by the formation of such a combination of manufacturing companies, said:

"The actual effect on the rubber-waste market of the formation of the Rubber Reclaiming Company was a depression in the market price of old rubber boots and shoes, owing to the combination of five buyers. The effect of the dissolution and the entering into the market of separate buyers had precisely the opposite effect upon the price of old rubber boots and shoes."

In view of the manifest consequences upon the market if the several factories operated by the Rubber Reclaiming Company should become independent buyers of such material, what did Rodenbach mean Simon to understand when he told him that the Rubber Reclaiming Company was entirely out of business? In the same connection he said "the market would be a good deal lower, because nobody would be in the market for rubber; there would not be any competition at all any more; they would be the only consumers." Manifestly, it was a question for the jury as to whether he did not intend that Simon should understand that the factories operated theretofore by the Rubber Reclaiming Company had gone out of the business, and would no longer engage in the business of reclaiming such rubber waste, and that the combination of which his particular corporation was a member would, as a consequence, be practically the only customer for such rubber. If he meant Simon to understand that the several factories of the Rubber Reclaiming Company were entirely out of business he represented a fact which was not true, and which was calculated to induce the very contract which Simon was reluctant to make. The instruction upon this part of the case was, therefore, error.

But this was not the turning point of the case. If it be assumed that the representation made by Rodenbach was intended to be understood as a representation that the factories theretofore operated by the Rubber Reclaiming Company had stopped the business of reclaiming rubber waste, and were no longer customers for such material, either collectively or individually, Simon learned that this was an untrue representation in May, 1895, at which time he had made only one small delivery and no purchases for future delivery. The effect of the separate operation of the factories theretofore controlled by the Rubber Reclaiming Company upon the market had manifested itself by a sharp advance in the price which he had to pay to collectors. Plaintiff at once complained, by letter and otherwise, and sought to be relieved in whole or in part from his contract. His complaints did not at first rest upon any other ground than that of hardship. Later he complained that they had promised to prevent competition in the markets of Cleveland and Buffalo. Still later in the course of his correspondence he charged deceit in the representations touching the principal matter. The defendant steadily refused any concession and demanded the due execution of the contract, and during all of this time Simon continued to buy at a loss, and to make monthly shipments in accordance with the contract. In a letter of June 10, 1895, addressed to the defendant, plaintiff, among other things, said:

"You knew what was coming, and, in order to secure a big lot, you promised us to protect us,—you wanted us to make a little money on the deal. Our attorney advised us to have the affidavit made out at once, but we don't desire to have any lawsuit with you, but will ask you kindly to extend the time as you say, and help us out a little, and divide the loss with us."

To this, defendant, after a general denial of liability for an advancing market, caused by competition which it could not control, demanded performance of the contract as to price and quantity, but

granted an extension of the time of delivery until December 1, 1895.

In the next letter the plaintiff more specifically charged operative deceit, saying:

"Had Mr. Rodenbach purchased the stock without those conditions and promises, we never would have mentioned anything, and would saddle the loss cheerfully; but he told us the Rubber Reclaiming Company is entirely out, which leads us to believe that rubber will decline, and that you would be about the only prominent people for this article, and for these reasons, and for others stated in our former letter, we hold him, the big lot rubber; but you have known that the firms connected with the Rubber Reclaiming Company would start in separate, which would naturally boom the article at once, and, under the circumstances, you ought to let us out entirely. If you can't do any better for us, we will, of course, deliver the balance rubber to December 1st, but we will remember you for some time to come. We will ship out two cars rubber to-day, and will also offer you 2 cars more for this month for 5½ cent, del'd. Please wire acceptance and oblige."

This acceptance of an extension of time of delivery was followed by another request for relief from balance of contract, and a threat to hold defendant liable for damages upon completion of the contract. This was in a letter under date of July 1, 1895, in which plaintiff, among other things, said:

"Mr. Rodenbach dragged me into it against my judgment, and by misrepresenting all the facts to me, telling me that the Rubber Reclaiming Company is entirely out, etc. We therefore ask you kindly that you let us out on the balance, and we will saddle the loss which we have sustained to the present date, or we will not waive one cent, and will make ourselves hold for the entire difference soon as the contract is finished."

Many letters were subsequently written by plaintiff, begging some concession, or for an opportunity to recoup losses by further contracts at prices by which some profit might be made, to all of which the defendant turned a deaf ear. The last deliveries were made in January and February, 1896. Plaintiff's last letter, February 19, 1896, closed with the announcement of his purpose to sue, in these words:

"At any rate, we will not drop our loss, when you show us the cold shoulder right along, and no effort on your part to do right and in accordance with your promises. We will bring all those points to an issue, and test the matter for all it is worth. We will not, however, despair trading with you, but will try and sell you right along, and make this a friendly suit, and will not allow it to interfere in any way in our future dealing with you."

The case for the plaintiff, in its most favorable showing, may be thus stated:

"The defendant has deceived and beguiled me into a contract which I would not have made but for reliance upon the willfully false statements of its agent, made to induce its execution. I discovered its deceit after beginning its execution. I could have stopped then, for the engagement was not obligatory, and by far the greater part of my contract was still executory. If I had stopped purchases and deliveries when I acquired full knowledge of the falseness of its representations, my loss would have been limited to the difference between the price I had paid for the rubber waste I had theretofore delivered and the price I received under the contract, and this loss I might have recovered in an action for deceit. But when I discovered the deceit I sought to be relieved in whole or in part from its further execution, and appealed to the defendant to make concessions. The defendant denied the deceit and demanded full performance, granting me only an extension of time for performance. In this situation, with full knowledge of the deceit, I accepted

this concession in respect of time of performance, but notified it that I would hold it liable for the loss I should incur in buying to fill my contract when it should be fully performed, and went ahead and executed the contract according to its terms. Defendant has paid me the price it agreed to pay, but I now demand the damages I have incurred in carrying out the contract according to its terms."

There can be but one answer to the case thus stated. The contract was not obligatory by reason of the deceit by which it was procured. If it had been fully executed before full knowledge of the deceit which made it nonobligatory, the plaintiff's remedy would have been in an action for the deceit. In such an action the measure of damages would not be the value of the contract if the representations which induced it had been true, but the loss which was incurred by reason of its execution. What the plaintiff might have gained would not have been recoverable, but only the loss which he sustained by its actual execution. Smith v. Bolles, 132 U. S. 125, 129, 10 Sup. Ct. 39, 33 L. Ed. 279; Sigafus v. Porter (decided Oct. 29, 1900) 21 Sup. Ct. 34, 45 L. Ed. ——. In Smith v. Bolles, cited above, the chief justice said, touching the measure of damages for deceit, that:

"The measure of damages was not the difference between the contract price and the reasonable market value if the property had been as represented to be, even if the stock had been worth the price paid for it; nor, if the stock were worthless, could the plaintiff have recovered the value it would have had if the property had been equal to the representations. What the plaintiff might have gained is not the question, but what he had lost by being deceived into the purchase. The suit was not brought for breach of contract. The gist of the action was that the plaintiff was fraudulently induced by the defendant to purchase stock upon the faith of certain false and fraudulent representations, and so as to the other persons on whose claims the plaintiff sought to recover. If the jury believed from the evidence that the defendant was guilty of the fraudulent and false representations alleged, and that the purchase of stock had been made in reliance thereon, then the defendant was liable to respond in such damages as naturally and proximately resulted from the fraud. He was bound to make good the loss sustained, such as the moneys the plaintiff had paid out and interest, and any other outlay legitimately attributable to defendant's fraudulent conduct, but this liability did not include the expected fruits of an unrealized speculation. The reasonable market value, if the property had been as represented, afforded, therefore, no proper element of recovery."

This being the rule of damages in an action by one who has been fraudulently induced to make either a contract of sale or purchase, it must follow that if one, after full knowledge of the fraud and deceit by which he has been induced to make a sale of property, goes forward and executes it notwithstanding such fraud, the damage which he thereby sustains is voluntarily incurred. The maxim volenti non fit injuria has application to all loss resulting from the voluntary execution of a nonobligatory contract with full knowledge of the facts which render it voidable. Fraud without damage is not actionable. If the fraud be discovered while the contract is wholly executory, the party defrauded has the option of going on with it or not, as he chooses. If he executes it, the loss happens from such voluntary execution, and he cannot recover for a loss which he deliberately elected to incur. Kingman v. Stoddard, 29 C. C. A. 413, 85 Fed. 740; People v. Stephens, 71 N. Y. 527; Selway v. Fogg, 5

Mees. & W. 83; Fitzpatrick v. Flannagan, 106 U. S. 648, 660, 1 Sup. Ct. 369, 27 L. Ed. 211. In the case of Kingman v. Stoddard, cited above, a full discussion of this question and an elaborate review of the cases supposed to hold a different view will be found. The opinion is that of the circuit court of appeals for the Seventh circuit, and was delivered by Jenkins, Circuit Judge. It is so full, clear, and satisfactory that we need not add to its reasoning. The fact that the defendant insisted upon performance, and that the plaintiff intended to perform, and then sue to recover the loss growing out of performance, cannot alter the principle. The plaintiff was under no legal compulsion to go on. What he subsequently did was in execution of the contract. The deliberate execution of it was an adoption of it with knowledge of the deceit, and in contradiction of his purpose to sue for deceit practiced in its procurement. He cannot save his right to sue for the fraud by notice that he will do so if he perform, and exact performance with full knowledge of the facts which rendered performance nonobligatory. Neither can the action be saved, after such voluntary performance, to the extent of the damage sustained by partial performance before full knowledge of the deceit. His duty was "to stop short or go on with it," to use the expression of Judge Bronson in Railroad Co. v. Row, 24 Wend. 74. The execution of the contract, so far as it was executory after full knowledge of the fraud, is equivalent to an adoption of the contract with knowledge of all the facts. "A subsequent promise, with full knowledge of the facts, is certainly equivalent to an original promise made under similar circumstances; and no one, acting with full knowledge, can justly say that he has been deceived by false representations." Fitzpatrick v. Flannagan, 106 U. S. 660, 1 Sup. Ct. 369, 27 L. Ed. 211. In Selway v. Fogg, 5 Mees. & W. 83, 85, Baron Park said:

"I also think, upon discovering the fraud, unless he meant to proceed according to the terms of the contract, the plaintiff should immediately have declared off, and sought compensation for the bygone time in an action for deceit. Not doing this, but continuing the work as he has done, he is bound by the express terms of the contract; and, if he fail to recover on that, he cannot recover at all."

But it is said that plaintiff did not have full knowledge of the deceit, in that he did not know before full performance that Rodenbach or his principal knew the falsity of his representations, and that this fact was not discovered until it came out in the evidence in this case. But plaintiff did discover as early as May, 1895, that the factories which had been operated before April 18, 1895, by the Rubber Reclaiming Company were in full operation, each for itself, and that each was in the market, actively competing for old rubber waste. The actionable misrepresentation, upon plaintiff's theory of the case, was that these factories were out of business, and therefore would not be competitors in the market for the material he undertook to collect and sell to plaintiff. It was not of the essence of his case that Rodenbach knew his representations to be false. If he made the representation, which it is claimed he did make, with the purpose of procuring the contract in question, and with the intent

that the plaintiff should act upon it, without knowledge as to whether it was true or not, it would be a false representation within the rule. Cooper v. Schlesinger, 111 U. S. 148, 155, 4 Sup. Ct. 360, 28 L. Ed. 382; Iron Co. v. Bamford, 150 U. S. 665, 14 Sup. Ct. 219, 37 L. Ed. 1215. Fraud is not waived unless there be conduct inconsistent with a purpose to disaffirm the contract after full knowledge of the facts which constitute the fraud, and raise an election whether the defrauded party will go on with the contract, or disaffirm what has been done. Mining Co. v. Watrous, 9 C. C. A. 415, 61 Fed. 163; Alger v. Keith (decided by this court Nov. 7, 1900) 105 Fed. 105; Moxon v. Payne, 8 Ch. App. 881. But full knowledge of a fraud does not mean that the party defrauded shall have knowledge of all of the evidence tending to prove the fraud. If he have knowledge of the material facts which go to make up the case of deceit as practiced upon him, it is sufficient to make him elect whether he will go on with the contract, or stop short and sue for the loss he has already suffered. Bach v. Tuch, 126 N. Y. 53, 26 N. E. 1019.

When the plaintiff learned, as he did in May, 1895, that the several factories which had been operated by the Rubber Reclaiming Company had not gone out of business of reclaiming old rubber, but were actively prosecuting that business, and in the market, each for itself, competing for waste rubber, he knew the material facts which went to make his case for deceit. By thereafter deliberately proceeding with the execution of the contract, he waived the deceit and affirmed the contract. Upon this ground the direction to the jury to find for the defendant was correct, and the judgment is accordingly affirmed.