Campbell, Chief Justice,
dissenting:
A contract for dredging a defined area was made, the work to be paid for at unit prices of twelve and a fraction cents per cubic yard. According to the measurements as they developed, the completed work should have cost the Government approximately $189,000. The plaintiff did not perform his contract. He dredged approximately 1,360,000 yards and was paid therefor the prices called for by the original and supplemental contracts the sum of about $143,000. To complete the work, involving the dredging of about 350,000 cubic yards left undredged by plaintiff, the Government paid to another contractor about $56,000, thus making a total expenditure of about $199,000. The contractor who finished the work bid and was awarded the contract to complete the work at its then most difficult stage at the rate of sixteen and a fraction cents per cubic yard. The plaintiff having been paid $142,959.10 for work done at contract prices, asks judgment for an additional sum of $545,121.72, and is by the judgment of the court awarded the additional sum of $211,050.09, making a total sum to plaintiff of $354,009.19. When to this is added the sum paid to complete the work which plaintiff by its two contracts undertook to do, it appears that the completed work will have cost the Government over $400,000 instead of $189,000 as originally contemplated and contracted for. To state it differently, the original contract price was 12.99 cents per cubic yard. The supplemental contract entered into after the plaintiff had ascertained the difficulties of which he complains reduced that price to ten cents and a fraction per cubic yard. The plaintiff abandoned the work, leaving a considerable part of the channel undredged, and for this a new contractor bid and was paid sixteen and a fraction cents per cubic yard. The plaintiff asks judgment for a sum which would made the dredging cost 40 cents per cubic yard instead of 12.99 cents per cubic yard, and the judgment in effect fixes the price at nearly 27 cents per cubic yard, though another contractor completed the work for about 16 cents per cubic yard.
*506 This seems to me to be a strange result to flow from the contract and supplemental contract in this case.
The statute requires contracts such as the one in question to be in writing. The law further requires a public letting of such contract. It has been properly said:
“ It must be borne in mind, however, that the law required the letting of contracts for public improvements to the lowest responsible bidder may be readily evaded if contractors are to be permitted, without seeking a recision of them, to obtain the fruits of the contracts by performance and then secure extra compensation upon some theory of mistake such as is presented concerning the plan in the case at bar.” Lentilhon v. City of New York, 102 App. Div. R., 548, 556, affirmed in 185 New York, 549.
The court must be careful not to make a different contract from what the parties made for themselves.
1. The plaintiff did not perform his contract or complete the work which by the same he undertook to do. Tie repeated his obligation to perform in a supplemental contract when the character of the material was known to him, and yet did not perform. He abandoned the work.
2. The supposed representations which are treated as in the nature of warranties do not amount to representations such as will sustain an action. At most they were expressions of opinion.
8. The measure of damages, if plaintiff could recover at all, can not be that which obtains in actions ex delioto at common law, because the court has not jurisdiction of cases “ sounding in tort.”
The facts show that several years prior to letting the contract for dredging in the Delaware River the Government had caused certain probings to be made, with a view of making an estimate upon the cost of the dredging for the information of Congress. These were made by the method of using a probe, which was an approved method of ascertaining the character of the bottom. It consisted in sinking an instrument into the soil by hand pressure and determining from the “ feel ” the character of the material through which the probe passed. That method was used throughout the length of the proposed channel, about 48 miles in length, and the probings were made at intervals of about a thousand *507 feet apart. A correct record was made of the results of these probings, and tracings were made therefrom, which correctly showed these results. At several places throughout the area the probe struck compacted material, which was impenetrable by the probe, and that fact was recorded on the field notes and likewise bn the tracing. Shortly after making these probings the same parties went again along the course at or near the places where the probe had struck the compacted material and used a system of what is called “ wash boring,” which brought up the character of the material. A correct record was made of what developed by the wash borings. At two of the places in the section covered by plaintiff’s contract, namely, at borings Nos. 113 and 114, the probe had struck said compacted material, and at those places wash borings were subsequently made as stated. In making up the map, which was later submitted with the specifications, to the proposed bidders, there were placed upon it the correct results of the probings at all places, except Nos. 113 and 114, and at those points there was on the map the correct result shown by the wash borings. It was not communicated to the bidders that the probes had struck the said compacted material at said two places. The specifications covered four sections. Plaintiff bid for and was awarded the contract upon the third section, designated as the lower end of Mifflin Range, connecting range and upper end of Tinicum Range. The length of the channel in the section involved was about 2 miles.
The following provisions of the general specifications attached to the contract are pertinent:
“ 7. It is understood and agreed that the quantities given in these specifications are approximate only, and that no claim shall be made against the United States on account of any excess or deficiency, absolute or relative, in the same. No allowance will be made for the failure of a bidder or of the contractor to estimate correctly the difficulties attending the execution of the work.
“(3) Lower end of Mifflin Range, connecting range, and uffer end of Tinicum Range. — -The dredging will extend from station 71+435, Mifflin Range, to deep water on connecting range, at about station 77+800, and from deep water at the upper end of Tinicum Range, at about station 80+800, to station 88, nearly opposite Du Pont’s upper wharf at *508 Thompson’s Point, New Jersey, and will include the widening of the bends to 1,000 feet at the intersection of Mifflin and connecting ranges, and at the intersection of connecting and Tinicum ranges. The quantity of material to be excavated is estimated to be lfMfifiOO cubic yards, scow measurement.”
“The stated amounts include dredging to a depth of 35 feet, mean low water, and additional cuts to equal side slopes of 1 on 5.
“ 17. Maps, data, etc. — The precise locations of the above-mentioned areas are shown on maps marked ‘Delaware Eiver, survey for 35-foot channel,’ which maps, showing the latest soundings taken over the areas, may be seen at this office, and should be examined by intending bidders before submitting proposals.
“ The mean rise and fall of tide in these areas is from 6 to 6.4 feet, and the velocity of the normal tidal current is at the rate of from l\ to 3 miles per hour.
“ The usual working season is from March 1 to December 31.
“21. Removal of logs, snags, etc. — The work to be done will include the removal of all obstructions to navigation, including wreckage, lumber, logs, snags, stumps, piles, bowlders, or other material (except ledge rock) found' within the limits of the work as it progresses, all of which shall be deposited on shore above high water or disposed of in some other manner, not detrimental to navigation, as may be approved by the contracting officer. (See also last sub-paragraph of par. 27.)
“ 27. The material to be' removed is believed to be mainly mud, or mud and an admixture of fine sand, except from station 54 to station 55-144, at the lower end of West Horseshoe Eange, where the material is firm mud, sand, and gravel or cobbles. Bidders are expected to examine the work, however, and decide for themselves as to its character, and to make their bids accordingly, as the United States does not guarantee the accuracy of this description.
“A number of test borings have been made in all of the areas where dredging is to be done under these specifications, and the results thereof may be seen by intending bidders on the maps on file in this office (see par. 17). No guarantee is given as to the correctness of these borings in representing the character of the bottom over the entire vicinity in which they were taken, although the general information given thereby is believed to be trustworthy.
“The price bid per cubic yard for dredging shall cover the cost of removal and disposition of all material encount *509 ered, except ledge rock or outcroppings of sufficient size to be so classified.
“Material to be classified as ledge rock must be of sucli composition as, in the opinion of the contracting officer, shall require blasting for its removal, and shall not include detached rocks or bowlders capable of being raised in one piece. Should ledge rock be encountered, all overlying loose material shall be removed at the price bid for the general dredging.”
The contract makes the specifications a part of it by reference. Section 8 of the contract provides:
“No claim whatever shall at any time be made upon the United States by the contractor for or on account of any extra work or material performed or furnished, or alleged to have been performed or furnished, under or by virtue of this contract, and not expressly bargained for and specifically included therein, unless such extra work or materials shall have been expressly required in writing by the contracting officer, the prices and quantities thereof having been first agreed upon by the contracting parties and approved by the Chief of Engineers.”
The plaintiff began the work after the approval of the contract in February, 1913, and on the 4th of May, 1915, a supplemental contract was made, in which it is stated as a reason for the modifications of the original contract as follows:
“ That in the prosecution of the work under said contract heavy and refractory material, consisting mainly of compacted sand and gravel, with a small percentage of cobbles, has been encountered; that the deposit of said heavy material in inclosed basins above high water is attended with extreme difficulty calculated to delay the completion of the work; and that the deposit of said heavy material otherwise than in inclosed basins above high water will not be injurious to navigation.”
By the supplemental contract there was a reduction of 2 cents per cubic yard scow measurement.
The plaintiff suspended work in December, 1915, after having dredged approximately 1,360,602 cubic yards, for which he was paid at the contract rates. Of this latter amount, about 585,000 cubic yards were dredged after the execution of the supplemental agreement. There remained to be dredged after plaintiff abandoned the work about *510 350,000 cubic yards of material, and this was subsequently dredged by another contractor, who bid and was paid therefor at the rate of about 16 cents per cubic yard.
The evident intention of the petition is to draw a distinction between the probings which were made and “ borings.” The specifications denominate them “test borings.” The specifications also speak of them as soundings (see par. 17), and the statement relied on by plaintiff is that the Gov-ei&ment had made “ a number of test borings ” in the areas where dredging was to be done. It is alleged that upon ascertaining the fact that “borings” had not been made the plaintiff suspended work.
The theory upon which the petition proceeds is stated in section 10, substantially as follows: That claimant understood from the specifications that the Government “ did not intend to warrant the material to be dredged to be ‘mainly mud, or mud with an admixture of fine sand,’” but that claimant “ did understand that the Government believed that such was the character of the material ” and did understand that it had information in its possession sufficient in its opinion to justify such a belief, and that included in that information was the information furnished by the specimens of the material which had been obtained through test borings made by the Government in the usual way for the purpose of ascertaining in the most direct and certain manner the character of said material, and that knowing that the Government had been having dredging done in the channel of the Delaware Eiver at this point for a long time prior to the date of said advertisement, and that it had had ample opportunities for and means of making itself acquainted with the real character of the channel, and that therefore “if the Government believed the material to be removed from the area in question” to be as above stated, “there was very little likelihood that the material was other than what the Government believed it to be,” and little risk involved in assuming that the Government’s belief was well founded, and that it made its bid for said work in reliance upon said representations of the Government with regard to the character of the material to be removed.
*511 The facts show that probings had been made and that these are an approved method of making “ test borings,” that is to say, they are made for the purpose of ascertaining the general condition of material to be dredged, the only other method which is used being what is called “ wash borings.” The evidence establishes that probing is the method used on the Delaware River to ascertain the character of material below.
It is apparent that the facts rebut the theory of the petition that there were no “test borings.” As has been said, probings were made, and the specifications speak of the latest “ soundings.” If the idea be that the plaintiff was misled by the term “ test borings,” it is plain that no recovery could be predicated upon that misleading statement, unless the term was used with the intention to mislead the plaintiff. Simon v. Goodyear Co., per Judge Lurton, 105 Fed., 573, 577. There is no proof that they were used with any such purpose, and on the contrary the facts show that the parties acted in good faith. Nor do the facts found otherwise establish a case authorizing a recovery. A fact found, and of which plaintiff had no information prior to the taking of evidence, is that at two places in the area included in his contract the probe developed hard and impenetrable material.
In this connection it may be said that it is a mistaken view that the Court of Claims must try all cases upon the facts developed regardless of the allegations of a petition. It is sometimes forced into this situation by the failure of defendants to interpose a demurrer. The statute (sec. 159, Judicial Code) requires the plaintiff in all cases to fully set forth the claim in his petition. Section 165 provides that when it appears to the court in any case that the facts set forth in the petition do not furnish any ground for relief it shall not authorize the taking of proof therein. Cases are frequently submitted upon demurrer, and appeals have been prosecuted from the court’s judgment sustaining a demurrer. The case of Thompson, Admr., 246 U. S., 547, is the latest illustration of this. The rules of the court require a plain, concise statement of the facts, free from argumentative, irrelevant, or impertinent matter in the petition. It is not unusual for the court to *512 require the plaintiff to make more specific his petition. All of the judges are agreed that it is within the power of the court to require the plaintiff’s case to be stated in the petition. In the instant case, which was not called to the court’s attention until after all the proof was taken and it was submitted upon the petition and proofs, we must consider it as presented and determine what is the case made by the facts.
The petition is drawn with more than usual care. The gravamen of it is misrepresentation inducing a contract.
In an action between individuals brought to recover damages on account of fraud or misrepresentation' by which a party has been misled into making a contract, the controlling principles of law are well settled. The only possible difference that can exist between the rights of a plaintiff as against an individual and his rights as against the Government where fraud or misrepresentation is relied upon must be found in the terms of the statute whereby the Government had consented to be sued in the Court of Claims. It has not consented to be sued in “ cases sounding in tort.”
When a party ascertains that he has been induced to make a contract by fraud or misrepresentation, he has a choice of remedies. He may rescind the contract or he may affirm it. He can not, however, do both. It is as difficult to do both, says Judge Sanborn in Wilson v. Cattle Ranch Co., 73 Fed., 994, “ as it is to ride at the same time two horses that are traveling in opposite directions.” Kingman v. Stoddard, 85 Fed., 740; Simon v. Goodyear Co., 105 Fed., 573; Smith v. Bolles, 132 U. S., 125. The principles announced in Wilson v. Cattle Ranch Co., supra, are approved by the Supreme Court in Sigafus v. Porter, 179 U. S., 116, 123.
In Kingman v. Stoddard, supra, Judge Jenkins made a careful examination and analysis of the authorities. He says:
“The rule is well settled that one who has been induced, through fraud, to enter into a contract has the election either to rescind, tendering back that which he has received, or, affirming the contract, he may have his action for deceit to recover the damages sustained. We, however, understand this rule to have application to a contract executed wholly or in part, and that the affirmance here spoken of has relation to the completed transaction; that is to say, *513 if recission be desired, and restoration of that received be not made, the contract is affirmed as to whatever has been done under it, and the defrauded party may still have his action for deceit. But we also understand the rule to be that if he become advised of the fraud perpetrated upon him in season to recede from his engagement and yet, with knowledge of the falsity of the representations which had induced the contract, elects to perform, and clearly manifests his intention to abide by the contract, he condones the fraud and is without remedy. * * * With respect to an executory contract, one may not, after knowledge of the fraud, continue to carry out, exacting performance from the other party to it, receive its benefits, and still pursue an action for deceit; and this because continued execution with knowledge of the fraud signifies the ratification of a contract voidable for fraud, and condones the fraud.” * * * And further, “ With respect to an executory contract, voidable by reason of fraud, the defrauded party, with knowledge of the deceit practiced upon him, may not play fast and loose. He can not appro-bate and reprobate. He must deal with the contract and with the wrongdoer at arm’s length. He may not, with knowledge of the fraud, speculate upon the advantages or disadvantages of the contract, receiving its benefits and at the same time repudiate its obligation.” Kingman v. Stod-dard, 85 Fed., 740, 746; Fitzpatrick v. Flannegan, 106 U. S., 648.
Having thus the right of election, a plaintiff who has been induced to enter into a contract by fraud or misrepresentation may, on affirming it, sue for damages. If the contract be an executed one, he may sue for the false representation, keeping what he has, and at common law, if the contract contains terms referring to the subject matter of the representations, he may sue upon the contract, or may sue in tort for the deceit. Where, however, the contract is executory, the party, upon ascertaining the fraud, has the option of going on with it or not as he chooses. “ If he executed it, the loss happened from such voluntary execution, and he can not recover for a loss which he deliberately elected to incur.” Simon v. Goodyear Co., 105 Fed., 573, 579. If he elect to perform, he must adopt the whole transaction or no part of it. He can not affirm what is for his advantage and repudiate the rest. An action for damages caused by fraudulent representation which induced a contract affirms the contract *514 and relies upon it, and therefore may be subject to the same defenses as an action brought directly upon the contract. National Bank & Loan Co. v. Petrie, 189 U. S., 423, 425.
Where the contract is executory, the party misled has a right of action, but at common law the form of the action becomes material in that event. The general rule is that where a party has not performed his contract and has abandoned the work, he can not recover upon the contract. Dermott v. Jones, 2 Wall., 1; 23 How., 220, 233; Cutter v. Powell, 2 Lead. Cases, 1, 33, 51.
An obstacle to the maintenance of his action where the contract is executory is that he can not aver performance on his part. He is not, however, without remedy because at common law he could still have his action for the deceit, and that was the form of action adopted in most of the cases above cited.
What then is the case submitted on the petition and proof ? It may be summed up as follows :
(1) That the defendants represented that they had made “ test borings ” when in fact probings had been made.. But probings come within the designation of test probings as used in the specifications, because it is the method adopted on the Delaware River, of which the plaintiff must have notice, or because it is not shown that there was any intention, by the use of the term, to mislead the plaintiff.
(2) That they represented that they “ believed ” the character of the material to be mainly mud, or mud with an admixture of fine sand. This was coupled with a positive declaration that the Government would not guarantee the accuracy of the designation and that bidders must satisfy themselves. They had ample time in which to make their own investigation.
(3) That, as shown by the proof, the probe at two places had encountered compacted material which it did not penetrate, and that fact was not communicated to the plaintiff.
The petition makes it quite plain by its tenth paragraph that the plaintiff understood that the Government did not intend to warrant the material to be dredged to be mainly mud or mud with an admixture of fine sand. It is also averred that the plaintiff had a plant which was adapted for *515 dredging the material named but was inefficient to dredge the material found to exist, and that (see par. 24) “ from the very beginning of the work the material encountered by plaintiff” was mainly material considerably more difficult to remove than mud or mud with an admixture of fine sand would have been.
If the representation went to the character of the material, it is plain that plaintiff knew of the misrepresentation “ from the very beginning,” and under the authorities above cited it was his duty then to have suspended, because continuance in the work after discovery of the misrepresentation waived the same and does not afford a right of action. This is made quite plain by Judge Lurton in Simon v. Goodyear Co., supra.
The gist of the matter is the character of the material. The. representation as to test borings, taken in connection with the other statements made in the specifications, excludes the idea that there was any intention to represent the character of the material. This fact is admitted in the tenth paragraph of the petition. And when asked to construe the statement by the defendants to be a positive representation, binding upon them, what is to be said about the representation made by the plaintiff, who, in submitting its proposal to do the work at twelve and a fraction cents per cubic yard, said: “ We make this proposal with a full knowledge of the kind, quantity, and quality of the work required”? That statement, made before the contract was executed, would be as reasonably binding upon the plaintiff, and therefore as inducing the action of the defendants, as the statement of the defendants was when qualified by the language they used.
But apparently the plaintiff does not rely upon that feature. The gravamen of his action is that the Government made a misrepresentation, either with reference to the test borings or to its belief as to the character of the material or in its concealment of a fact. There is nothing in the specifications to show that the defendants stated or undertook to communicate to plaintiff all information in their possession, as was the Christie case, infra. The fact of compacted material having been found can therefore only go to that phase *516 of the representation that they “ believed ” the material to be of a certain character.
To maintain his action the plaintiff must not only show a positive representation which misled him, but a representation upon which he had a right to rely and did rely. Unless no effect be given to the language of the specifications, there could be no reliance placed by the plaintiff upon the defendants’ representation, if it can be so called. The rule announced in the Simpson case, 172 U. S., 372, is a salutary one that should not be lightly passed over. It controls the instant case.
With full knowledge of the character of the material to be dredged, the plaintiff continued at work for more than a year and then made a supplemental contract whereby the price he was to receive was reduced on account of the fact that he was relieved from handling the heavier material in the manner prescribed by the original contract. He thereafter continued under the supplemental contract the work for many months. So far from making a positive representation as to the character of material to be dredged, the defendants excluded that idea by the most positive terms, in that they said that “ the United States does not guarantee the accuracy. of this description.”
This condition, as we have stated, is recognized by the petition in paragraph 10 thereof. The specifications informed the bidders that the work to be done would include the removal of all obstacles to navigation, and by section 8, that no claim whatever should be made on account of extra work unless it was required in writing by the contracting officers. The facts fall far short of showing that the plaintiff had any right to rely upon the alleged representations. It requires no citation of authority to show that if the representation Was an expression of opinion, it can not form the basis of an action, unless it be shown, as it is not in this case, that the opinion was expressed with the purpose or intention of misleading the- bidder. This case is materially different from the Hollerbach case, 233 U. S., 165, and the Christie case, 237 U. S., 234. In the Hollerbach case there was a positive representation as to the character of the filling back of the dam, and the plaintiff had to go through that *517 filling in order to perform the work which he undertook to do. In the Christie case there was a positive statement that the material to be excavated, “as far as known,” was shown by probings, and it developed that all the information which the defendants had from the probings was not communicated to the claimant. The statement, however, was positive. In that case also there was not time for the plaintiff to make an independent investigation, and in the instant case there was such time. The material encountered in both of the cases was an incident to the general work to be performed under the contract, and therefore the going through a filling in the dam or the removal of logs in the river were things that had to be done in order to perform the contract. In the instant case there was no positive representation as to what the material would be, and when it is borne in mind that the probings were 10 in number, about a thousand feet apart, and therefore extending over an area of nearly 2 miles, that the material to be dredged was of that length, and 600 or more feet in width, it seems impossible to conclude that those probings or borings should be taken as representations by the defendants that the material to be dredged was of the character shown by the probings. Groton Bridge Co. v. A. & B. Ry. Co., 31 So. Rep., 739.
Nor is this case ruled by Atlantic Dredging Co., 35 C. Cls., 463. In that case there was a positive representation as to the character of material. The plaintiff suspended work and the Government brought suit in the Circuit Court for the Eastern District of New York, after finishing the work, to recover the difference between what plaintiff had agreed to do the work for and the Government had paid to have it done. The contractor prevailed in that suit, and later brought an action in this court to recover a retained percentage held by the Government and also damages. The court treated the question as res adjudicate, and held that the Government was estopped to make certain defenses. The plaintiff was allowed to recover the profits he alleged he would have made if the material had been as represented. The court treated the representation as a warranty and applied the rule of damages applicable in suits upon warranties. The measure of damages thus adopted is open to *518 question. Sigafus v. Porter, 179 U. S., 116, 123; Huganir v. Cutter, 102 Wis., 323. In a subsequent case, Lewman, 41 C. Cls., 470, which is much more like the instant case than the Atlantic Dredging Company case, 35 C. Cls., is, the latter is distinguished. Burgwyn case, 34 C. Cls., 348. See also Ferris case, 28 C. Cls., 332.
Another question appears to arise in this case if it be asumed that the plaintiff, if his action were between individuals, would have a cause of action. While three of the judges concur in the view that the plaintiff is entitled to recover, three of the judges agree that by the petition as well as the facts relied upon there is presented an action ex delicto, one of the judges holding the view that whether the action be ex delicto or not it can be manitained as being for a claim founded upon a contract, express or implied. The question therefore arises as to whether this court has jurisdiction. Section 145 of the Judicial Code confers jurisdiction to hear and determine claims founded “upon any contract, express or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect of which claims the party would be entitled to redress against the United States, either in a court of law, equity, or admiralty, if the United States were suable.”
It being the duty of all courts to recognize the limits of their authority (Reid's case, 211 U. S., 529), it is essential that the court observe the line of demarcation between cases of which it has jurisdiction and those of which it has not jurisdiction, because “judicial duty is not less fitly performed by declining ungranted jurisdiction that in exercising firmly that which the Constitution and the law confer.” Ex parte McCardle, 7 Wall., 506, 515.
In Gibson's case, 29 C. Cls., 18, where the court considers the Tucker Act (sec. 145), it is said:
“The restriction of the jurisdiction of the court to contracts, express or implied, has, in the judgment of the Supreme Court, recognized the well-understood distinction between matters ex contractu and those ex delicto, and has excluded from the consideration of the court cases which are founded upon wrongs and such as can be adjudicated only in the form of an action ex delicto.” Lanman’s case, 27 C. Cls., 260.
*519 In Langford's case, 101 U. S., 341, 345, the question is considered, and it is said:
“ And it would ill become us to fritter away the distinction between actions ex delicto and actions ex contractu, which is well understood in our system of jurisprudence.”
In Hill's case, 149 U. S., 593, 598, the cases are reviewed and the doctrine of the Langford and the Jones cases, 131 U. S., 1, is repeated, the court saying:
“The United States can not be sued in their own courts without their consent, and have never permitted themselves to be sued in any court for torts committed in their name by their officers. Nor can the settled distinction, in this respect, between contract and tort, be evaded by. framing the claim as upon an implied contract.”
See also Bigby's case, 188 U. S., 400, 406.
“ Nor is the difference merely formal or technical between actions founded in tort and in contract.” Garland v. Davis, 4 How., 131, 144.
In Dooley's case, 182 U. S., 222, the action was sustained not upon the theory of any contractual relation but because the action was founded upon a law of Congress. That case was considered in Basso's case, 239 U. S., 602, where the court adheres to the principles announced in Schillinger's case, 155 U. S., 163. In the latter case concession was made by the appellant that the cause of action sounded in tort, and he contended that this court has jurisdiction under the Tucker Act over claims ex delicto founded upon the Constitution of the United States. He relied upon the Dooley case, but the court recognized that to carry out that contention would involve, by implication at least, the overruling of the Schillinger case, and said:
“ We are not disposed to overrule the case, either directly or by implication.”
It is to be observed that the statute forbids jurisdiction of “ cases sounding in tort.” The Supreme Court has held that in order to give the Court of Claims jurisdiction under the Tucker Act, the demands sued upon must be founded on “ a convention between the parties ” — a coming together of minds — and that there is excluded as not meeting this condition those contracts or obligations that the law is said to *520 imply from a tort. Russell's case, 182 U. S., 516, 530; Harley's case, 198 U. S., 229, 234; Juragua Iron Co. case, 212 U. S., 297, 309. In this court a party may not waive a tort and sue in assumpsit. Bigby's case, 188 U. S., 400, 409, citing Cooper v. Cooper, 147 U. S., 370, 373.
I take the rule, therefore, to be that if the case made by plaintiff be one ex contractu at common law the court has jurisdiction, and if the case made by the plaintiff could only be maintained at common law by an action ex delicto, the court has not jurisdiction.
A test of whether the case is one of contract or tort under the form of declaration at common law has been said to be that “ if specific breaches are assigned, sounding ex delicto, it is case on the tort.” New Jersey Co. v. Merchants' Bank, 6 How., 344, 433. The latter seems to be the character of plaintiff’s case, assuming that he has one.
The claim of damages in the petition is clearly the measure of damages which obtains in actions for deceit, and is not the measure of damages in actions for breach of contract. Smith v. Bolles, 132 U. S., 125, 129. In other words, the plaintiff claims all that he expended in and about the work, notwithstanding he agreed in the first instance to do the dredging at a fixed price, and thereafter, with full knowledge of the conditions, made a supplemental contract by which he voluntarily reduced the price fixed in the original contract, and as I understand the court’s judgment, the plaintiff is awarded judgment for what he actually expended in the prosecution of the work. The “ loss ” thus ascertained is the measure of damages for deceit. And it is to be remembered that the plaintiff is compensated, not upon the theory of the value of his work to the defendant, nor upon the theory of what the reasonable cost would have been if he had had a plant reasonably adapted to the work. He con-, cedes that he had a plant that was inefficient for the work as it actually developed, and he seeks judgment for what the work with that kind of a plant cost, and is awarded judgment accordingly.
The facts rebut the idea that what it cost the plaintiff to do the work is even measurably a basis for a judgment, be *521 cause it appears that the work, at its most difficult stage, was completed by another contractor,- who had, we may assume, a suitable plant with which to do the work, and the price paid for the completion of the work was about 4 cents more per cubic yard than plaintiff’s original contract called for. Nor can the case made by the facts or alleged in the petition be said to be for a claim founded on contract, express or implied. It is true that the plaintiff may rely upon the contract as evidential, but what he seeks to recover for is a misrepresentation which preceded the contract. His action at common law would be trespass on the case for misrepresentation, and such a case sounds in tort. National Bank & Loan Co. v. Petrie, 189 U. S., 423, 425; Smith v. Bolles, supra; Occidental Const. Co. v. United States, 245 Fed., 817.
At common law an action ex contraotu can not be sustained by a case ex deUcto or vice versa. The measure of damages in the cases is different, as frequently are material elements that go to make up the case. Even in States where the common-law forms of action have been abolished, it is held that “ the code does not authorize a recovery where the complaint alleges facts showing a cause of action in tort by proving on the trial a cause of action in contract.” Wilson v. Haley Co., 153 U. S., 39, 47.
The Government having withheld jurisdiction from this court of cases sounding in tort, it would be an anomaly to hold that the plaintiff may recover in a case sounding in tort under the guise of a claim founded on contract. Occidental Constr. Co. case, 245 Fed., 817.
Downey, Judge, concurs in this dissenting opinion.