Argued April 5, affirmed May 28, 1929.

ELLA WECKERT, ADMINISTRATRIX, *v.* WENTWORTH & IRWIN, INC.

(277 Pac. 815.)

For appellant there was a brief and oral argument by *Mr. Will H. Masters.*

For respondent there was a brief over the names of *Mr. L. W. O'Rourke* and *Mr. Oren R. Richards.*

McBRIDE, J.—The facts, as detailed by plaintiff with some corroboration on the part of the witnesses introduced by him as to the repairs, are about as follows:

On November 24, 1926, plaintiff bought the truck, turning in a Dodge roadster at $350, and on the 26th took it home. It had a slight knock when he bought it, which defendant assured him was only a spark knock. Plaintiff drove the car to Sherwood and around his home, and finding the knock getting worse, on December 4, 1926, took it to Laringe's garage at Sherwood to ascertain the cause of the knock and found two or three bearings were entirely gone. The babbit fell out and the car was in bad condition. He had it repaired, but fearing that the license plates were not such as could be used on a truck, being license plates for a bus, he did not use it to any extent, and on January, 1927, took out a new license. About January 20th, plaintiff went to Waldport for cattle and on the way back the bearings again became loose and he ran the car into a shop at Tualatin. The threads were so bad on the pan

underneath that the mechanic had to rethread them, and plaintiff had to leave the truck in the repair-shop about a day. Two days later, which would be about the 22d or 23d, he again went to Waldport, accompanied by Mr. McPoland, and brought in four head of cattle. Coming in, the engine would not pull, and the truck had to be towed up the grade by road trucks pushing and pulling it. At Whiteson, another bearing burned out and he had to be towed into McMinnville. He had new bearings put in and another one tightened, and then made another trip in January when he had little trouble. Later, he made another trip where he had the usual difficulties, and finally, about February 28th, took the truck to the White Company where he had about $31 of repairs made on it. He had the valves ground and two or three new ones put in. After that he made another trip to Waldport, had the same trouble with the valves and bearings, and had to be towed part of the way. The next day he came to Portland, being towed in, and went to Wentworth & Irwin, Inc., defendant corporation, with the truck and requested them to "stop that burning out of the bearings." On April 2, 1927, they made some repairs at a charge of $12 which plaintiff refused to pay. The controversy was finally settled by plaintiff paying one half of the repair bill, or $6, and paying $25 on his contract as a condition of their allowing him to take the truck out of the shop. Having paid the sum of $31 in all, he took his car home and in attempting to haul another load of cattle, the bearings burned out again, and he was forced to hire another person to complete his contract for hauling. He took the truck to his home and laid it up for a while and finally took it to Portland and stored it in a garage from which it was

taken into possession by defendant in May or June, 1927. After his last experience with the truck, he had his wife write a letter to the defendant Wentworth & Irwin, concerning which he testified as follows:

"Yes, that was after Wentworth & Irwin had fixed it. I laid the truck up and I had my wife write a letter. I wanted something did about the truck. I would make no more payments on this truck until they would give me back my Dodge machine or fix the truck or did something and I didn't get no answer from this letter. I waited a week or ten days and got no answer from the letter. I am sure that the letter had a return on it and I never got no return back, and then I put it in the hands of attorneys."

When plaintiff was cross-examined as to the cause of his delay in protesting to Wentworth & Irwin, as to the condition of the truck, he testified, among other things, as follows:

"Q. Now, during this time that you had these bearings burned out Mr. Weckert, you were satisfied then that the truck wasn't any good, wasn't you, mechanically?

"A. No, I wasn't satisfied that the truck wasn't any good mechanically, I thought that it might be in the oil lines, I think that time when I had them put in had him take the oil feeds off and be sure that they were clean, and I think at that time that one of the oil pipes was plugged, and I figured that was the trouble in having them burn out, and I kept on going on with it until it burned out again."

The foregoing is about the sum of his testimony. It was elicited in a rather disjointed way, especially as to dates. It is admitted by both parties that the following payments were made by Weckert upon the purchase price of the truck, which, by the contract,

was to be paid for at the rate of $41 per month and interest, the first payment to be made December 24, 1926, and on the twenty-fourth day of each month thereafter. The first payment with interest, excluding the $350 allowed on the exchange of the Dodge car, was made January 3, 1927, amounting to $44.33, February 18, 1927, $44.06, March 26, 1927, $5.58 interest, and April 5, 1927, $25, making a total of $118.97, shortly after which he declined to make other payments.

■ There can be no question that there was evidence to go to the jury that defendant made the representations alleged in the complaint; that plaintiff informed the defendant of the use he intended to make of the truck; that they told him it was in good mechanical condition, and that, relying on such representations plaintiff was induced to enter into the contract. While there is no direct evidence that the defendant intended that plaintiff should rely on such representations, the circumstantial evidence is strong to that effect. While the plaintiff had had experience in driving ordinary automobiles, the testimony indicates that, beyond slight exceptional instances, he had not driven trucks, and, even if he had such experience, it would rarely extend to any expert knowledge of their mechanical condition. In regard to these matters, common experience teaches us that the average driver, or user of an automobile is largely dependent upon experts who make knowledge of the mechanism of such machines a part of their business. The fact that the truck began to function defectively from the very first and continued to do so up to the time plaintiff used it indicates that it was in fact defective, and not fit for the purpose for which plaintiff bought it when he was induced to make the purchase,

and that the defendant either knew, or ought to have known that fact when it made the representations complained of. So far, we think the plaintiff's case is beyond reasonable dispute. The truck, so far as it pertains to the purposes for which plaintiff purchased it, was worthless and would cost more to operate it than it would to hire the trucking done by other parties. In fact, it was worthless for any purpose except for a sale to the unwary.

■ The main question in this case is whether or not the plaintiff had lost his right of action against defendant by retaining the truck after the defects became manifest. A vendee defrauded by false representations has, as to a case of this character, an election of remedies. He may offer to return the property purchased and demand the return of the purchase money or thing given by him in exchange and sue in equity for rescission, or he may keep the property and sue for damages, the measure of damages being the difference in value between the property as represented and its real value, and, in some cases, incidental damages caused by his acting on the false representations. When he elects to sue for damages, he is not bound to wait until the contract is fully performed: 27 C. J. 20, § 131, and cases there cited. *Moran* v. *Tucker,* 40 R. I. 485 (101 Atl. 327, L. R. A. 1918A, 99), is a case in point wherein the doctrine is summed up by Justice SWEETLAND as follows:

"In many cases where the contract is only partially executed it would be unjust to hold, because of the theory on which the action of deceit is said to be based, that the party defrauded shall lose the advantage which, in our practice, attaches to a tort action, unless he makes further venture in the transaction into which he has been induced by fraud to enter."

The authorities *pro* and *con* on this subject are very fully collated in notes on *Moran* v. *Tucker, supra,* and *Van Natta* v. *Snyder,* 98 Kan. 102 (157 Pac. 432, L. R. A. 1918A, 102). An examination of the authorities cited in these two cases satisfies us that plaintiff's claim for damages was not waived in this case. It is to be remembered that the plaintiff had put $350 into the truck as an initial payment by turning in his automobile at that price, and that his first real test of the truck was late in January, 1927. The only test before that was on December 4th, and its failure to function properly on that occasion might well have been due to other causes; but plaintiff claims that he attributed it to failure in the oil lines so he continued to use it on perhaps five trips in January and February when its repeated failure to function satisfied him that it was mechanically defective. Finally, in April he went to the defendant corporation and requested them to repair the truck so that the bearings would not be burned out in its operation, and when he found that it still continued to be defective, he laid it up, refused to make further payments, and "employed an attorney."

A different situation would have presented itself if the contract had been wholly executory but it was not. Plaintiff had partially performed and this takes it out of the rule laid down by the authorities cited by defendant, which, when analyzed go only to the extent of holding that, while the contract remains wholly executory, a vendee, receiving knowledge of a fraud in its inception, waives the fraud by making a payment on the contract.

The principal case cited by defendant, *Kingman & Co.* v. *Stoddard,* 85 Fed. 740 (29 C. C. A. 413), in effect goes no further than this, although some *dicta*

in the opinion seem to do so. Another case, *Mc-Donough* v. *Williams,* 77 Ark. 261, 265 (92 S. W. 783, 7 Ann. Cas. 276, 8 L. R. A. (N. S.) 452), upon which counsel for defendant seems to rely, is not in point here. In that case there were facts that indicated that Williams, who was the party plaintiff in the court below, suspected that fraud was being practiced upon him before he made the contract, in fact, before signing, he said:

"Mr. McDonough if you have obtained this stock from me fairly and squarely, without any misrepresentations, it is all right, you can have it; but if you used any undue influence or chicanery in getting possession of this stock, you will probably hear from me later on."

After some further colloquy with the purchaser in which the purchaser told him that he need not sell him his stock if he did not wish to do so, but that, if he bought it, it was his to do with as he pleased, Williams signed over the stock. In other words, he assigned the stock with the belief that he was being, or might be defrauded, and the court held that having entered into the contract, under such circumstances, he waived the fraud if any was committed. But this was a case where the plaintiff was suspicious of a fraud before he made the contract and sold the stock. The stock was still his and if he suspected fraud he had free volition to refuse to sell. In the case at bar, the plaintiff partially performed his contract before the truck was delivered. He had $350 invested in the purchase and, in view of the representations made by the seller, it was to his interest not to rush into a controversy until he had fully tested out the car. After six trips, which were real tests, he finally and

justly came to the conclusion that he had been deceived, and brought this action. We do not think that the patience and caution of plaintiff in fully trying out the truck before refusing to make further payments, and the fact that he in the meantime made several payments on the purchase price should be held as a waiver of his right to sue for damages. In fact, no such waiver is alleged in the pleadings, either by way of estoppel or otherwise, and, if it were, we hold that it would have been ineffective under the circumstances. It will be noted that if there is any evidence to support the verdict, this court has no authority to weigh its force against conflicting evidence, and it must be admitted that, upon some points, the evidence is conflicting. We merely say that, as the jury believed plaintiff's evidence, we are bound by their decision.

■ There is an exception to the instruction of the court on the measure of damages, which arises from the following circumstances. The court in the first instance gave the following instruction, which counsel for defendant concedes to be correct:

"I instruct you that the measure of damages in this case would be the difference between the amount that the plaintiff paid for said truck and its fair market value at the time of entering into the contract for its purchase. It is admitted in this case that the car which the plaintiff traded in was of the value of $350.00. That amount, the $350.00 together with any amount that the plaintiff paid on the installments on said contract would be the amount that the plaintiff had paid in, and the difference between that amount and the value of the truck that he received from the date that he traded for it would be the measure of his damages in this case."

Thereafter, the jury were recalled and the following ensued:

"The Court: There is one point here that I evidently didn't make clear to you, in the verdict that you have rendered. I didn't mention that in so many terms and in so many words, and perhaps you didn't get that notion. In the complaint in this case—have you the complaint here, Mr. Bailiff?

"Foreman: They are all in the jury room.

"The Court: Very well. In the complaint in this case it is admitted that there was paid $350.00, and a further amount of about $118.00 monthly installments. Then it is admitted in the complaint that the automobile was worth $75.00 to $100.00. That is the language of the admission. The measure of damages would be the amount paid in, as I heretofore instructed you, less the market value of the automobile at that time. In that event, under the admission in the pleading as to the value of the automobile, we could not have a verdict in this case of more than $350.00 plus $120.00 less $75.00. That would be under the admitted pleadings in this case. I take the responsibility, ladies and gentlemen, not in any way charging you with failure to listen to the instructions of the court, but the court didn't make that point plain.

"A Juror: That was why I asked for the instructions, because I wasn't certain just what you meant by your instructions, and the others all thought they did know.

"The Court: I can see how you might become confused, because I didn't say in so many words that you couldn't find for a greater amount than that, although the rule of damages is just as I gave it to you. The value of the automobile is admitted at $350.00. The payments are admitted to be $118.00, I think, and perhaps some cents. You will find it in the pleadings. Add those two together and then subtract therefrom the reasonable market value of the car that the plaintiff traded for it—the one that he bought—at the time of his purchase."

It seems reasonably clear that the court was cautioning the jury that plaintiff, having in his pleadings, as well as by his testimony, fixed the value of the truck, the jury could not put the value of the truck at a less figure. While the instruction could have been phrased in better terms, we do not think it misled the jury. There are other exceptions to the failure of the court to give requests asked by the defendant, but so far as being applicable, they are covered by the general charge.

■ ■ Since this opinion was in manuscript, counsel for defendant has called our attention to the case of *Bonesteele* v. *National Union Fire Ins. Co.*, 128 Or. 554 (275 Pac. 808), where there was no allegation as to the market value of the automobile at the time of its destruction by fire, and no evidence of its value at any time except the fact that it was insured for a certain sum six months previous to its destruction. The policy was conditioned by the insurance company that, in the event of its destruction, the insurer would pay the market value of the machine at the time of its destruction. We there held that the fact that it had been insured for $1,700 six months before furnished no criterion by which to judge its market value six months subsequent thereto. Here the case is entirely different. The plaintiff alleges that the truck was and is not of the value of $850, but is of no greater value than $75 and that it was at the time of purchase, and, since that date, wholly defective and mechanically imperfect, and his evidence, if the jury believed it, as they evidently did, indicated that it was practically worthless from the time he bought it until defendant repossessed it. There is no evidence that the machine was misused while plaintiff had it, but there is evidence that plaintiff was from the very first

expending considerable sums of money to make it serve his purpose. The jury was justified in finding, if they believed the testimony of plaintiff and his witnesses, that defendant sold plaintiff a worthless machine, and, but for the admission in the complaint that it was worth $75, would have been justified in finding that it had no value. Of course there was evidence on behalf of defendant to the contrary, and the writer or other justices might, if they were triers of the facts, be inclined to take the testimony of plaintiff *cum grano salis,* but the verdict of the jury is conclusive on that phase of the controversy.

Finding no reversible error, the judgment is affirmed. AFFIRMED.

COSHOW, C. J., and RAND and ROSSMAN, JJ., concur.